COMMONWEALTH vs. ROBERT C. BEAUCHAMP.

Middlesex. February 5, 1997. - April 9, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Appeal, Instructions to jury, Retroactivity of judicial
holding, Reasonable doubt, Argument by prosecutor, Assistance of
counsel. *Self-Defense.*

In a 1971 second degree murder case, tried before the decisions in *Mul-
laney* v. *Wilbur,* 421 U.S. 684 (1975), and *Commonwealth* v. *Rodriguez,*
370 Mass. 684 (1976), in which, because of the defendant's escape and
subsequent out-of-State incarceration, the defendant's direct appeal was
delayed until 1997, this court undertook to review the conviction under
G. L. c. 278, 33E, to determine whether the trial judge's instructions on
self-defense met due process requirements. [685-686]
In a murder case tried in 1973, in which direct review of the conviction
was had in 1997, the judge's repeated use of the word "find" with re-
spect to the defense of self-defense claimed by the defendant, without an
explicit instruction that the Commonwealth bore the burden of proving
the absence of self-defense beyond a reasonable doubt, might have left
the jury confused as to which party bore the burden of proof on the is-
sue: the defendant was entitled to a new trial. [688-690]
At the retrial of a criminal case, the prosecutor may not elicit evidence of
the defendant's silence, his request for an attorney, and the discussions
the defendant had with his attorney to argue that the defendant had
fabricated his story [690-691]; nor should the prosecutor encourage the
jury to conduct experiments or to obtain outside information [691].
At the retrial of a 1971 murder case in which direct review was had in
1997, the issues of exclusion under the Fourth Amendment to the United
States Constitution of certain evidence seized without a warrant in the
defendant's apartment after he had been arrested and removed from the
premises were to be governed by principles set forth in *Mincey* v.
*Arizona,* 437 U.S. 385, 393-395 (1978). [691-692]

INDICTMENT found and returned in the Superior Court on
September 15, 1971.

The case was tried before *Robert Sullivan,* J.

A request for leave to file late an application to appeal,
filed on July 9, 1996, was considered by *Wilkins,* J., in the
Supreme Judicial Court for the county of Suffolk.

*John M. Thompson* for the defendant.

*David W. Cunis,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, Robert C. Beauchamp, was indicted for the murder in the first degree in 1971. The jury returned a verdict of guilty of murder in the second degree, and the defendant was sentenced to life in prison. No appeal was taken from the conviction or from the denial of the motion for a new trial. In 1974, the defendant failed to return from a furlough. He was finally apprehended in California in 1981 where he was charged with Federal crimes. After serving Federal sentences in California and Illinois, the defendant was returned to Massachusetts on a Governor's warrant in 1987. See 413 Mass. 60 (1992). After a series of motions for a new trial, see 35 Mass. App. Ct. 1106 (1993), the defendant petitioned a single justice of this court for leave to file a late application to appeal from conviction. The single justice granted that motion, and we now review the defendant's conviction on direct appeal and under G. L. c. 278, § 33E.[1] We reverse the conviction.

I

On August 5, 1971, the defendant called the police to report that he had just shot the victim. The police arrived to find the victim dead on the stairs outside the defendant's apartment. The victim had been shot four times at close range. Medical evidence suggested that at least one shot was fired from behind the victim. The victim was shot inside the apartment, turned to flee, and then fell and died on the stairs outside. The victim was found with his keys a few inches from his right hand, a can of mace in his jacket, and some cash and a considerable amount of travelers' checks.

At trial, the defendant admitted to shooting the victim, claimed self-defense, and gave the following account of the events: The defendant and the victim had known each other and been friends for a number of years, and they had just returned from a short vacation together about one month

---

[1]Although G. L. c. 278, § 33E, was amended in 1979 so that it no longer requires this extraordinary review when a defendant indicted for murder in the first degree is convicted of murder in the second degree, we have held that that amendment is effective only as to offenses committed after July 1, 1979.

before the shooting. The turn of events leading to the killing began in 1966 when the victim stole a copy of the national merit scholarship examination and gave a copy to the defendant. The defendant scored very well and received a scholarship to the University of California at Berkeley. The victim, however, did not reap an advantage from the examination and was "stuck at W.P.I."[2] The defendant compensated the victim with gifts, but the victim was dissatisfied and tried to extort money from the defendant. After the vacation they took together, the victim became more hostile and threatened to "cut [the defendant] up." On the day of the shooting, the defendant relayed a message to the victim that he would like to see him in a few days. The victim called back and demanded to come over immediately, and the defendant acquiesced. According to the defendant, the victim arrived under the influence of drugs, and demanded money. When the defendant refused, the victim began yelling obscenities and went into the kitchen. The victim returned with a large butcher knife. The defendant fired a warning shot to no avail. In the ensuing skirmish, the defendant fired and hit the victim four times. The defendant testified that within the course of the skirmish, he tried to get the knife from the victim, and he retreated as much as he could until he was backed against the wall in attempt to avoid shooting the victim.

When the police arrived, they found the gun and the knife in plain view. The knife had no fingerprints on it, but the defendant testified that the victim used a napkin to hold it. The defendant's mother testified to seeing a crumpled napkin, but the police officers did not see it, and it did not appear in any police photographs. In addition, there was a deep, crescent shaped indentation on the wall in the apartment, and the victim had an abrasion on his knee made shortly before his death that matched the indentation. The defendant was arrested and booked the day of the shooting. That evening, the police searched his apartment without a warrant, found spent bullets from the shooting, and took some photographs.

After being released on bail, the defendant fled to California where he was apprehended and returned for trial. The defendant was convicted of murder in the second degree and sentenced to life in prison. Shortly thereafter and before his appeal was perfected, the defendant escaped from prison. He

[2]Worcester Polytechnic Institute.

was apprehended in 1981 in California where he was charged with committing Federal crimes. After serving prison sentences in Federal prisons in Illinois and California, the defendant was returned to Massachusetts on a Governor's warrant. The defendant then filed a series of motions for a new trial, alleging errors in the trial and claiming that his trial testimony was fabricated to conceal the fact that the killing was actually part of a cover-up of Federal Bureau of Investigation, Central Intelligence Agency, and White House involvement in an attempt to prevent the so-called "Pentagon Papers" from being turned over to the Soviet Embassy in Washington.[3] After those motions were denied, the defendant sought leave from the single justice of this court to file late an application to appeal from his conviction. The single justice granted leave to file this appeal.

## II

The defendant's trial took place in 1973, slightly more than two years before the United States Supreme Court's decision in *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975). In that case, the Court held that the State must bear the burden of proving "beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 704. Shortly thereafter, we held that the principle in *Mullaney* applied with equal force to claims of self-defense, *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-689 (1976), and proposed a model instruction. *Id.* at 692 n.10. The defendant's case is here on direct review. This case presents an anomaly. Had the defendant perfected his appeal in the normal course, it is possible he would not have been able to take advantage of *Rodriguez,* which might not yet have been decided. Ordinarily, a criminal defendant gets the full benefit of any changes in the law while on direct review, see *Griffith* v. *Kentucky,* 479 U.S. 314, 320-328 (1987), but after direct review, his ability to call his conviction into question based on new decisions is strictly limited. See *Commonwealth* v. *Amirault, ante* 618 (1997). It is only because of his escape and subsequent incarceration that his appeal has been so long delayed, enough for the law to have changed in his favor. We are reluctant to conclude that where the defen-

---

[3]The "Pentagon Papers" had already been published by the New York Times and other newspapers at the time of the killing.

dant, by his own fault, fails to take a direct appeal in a timely fashion, he should nevertheless reap the benefit of changes in the law which occur between his trial and his direct appeal. Since we conclude that the defendant is entitled to a new trial in any event, we review the appeal based on the law at the time of the trial. The restriction on the application of new rules on direct appeal does not apply in this case because we have since held that *Rodriguez* applies retroactively and that failure to preserve the issue at trial does not constitute waiver because the law was not adequately developed before *Mullaney* and because the issue of burden of proof goes to the heart of the truth-finding function. *Commonwealth* v. *Stokes,* 374 Mass. 583, 588-590 (1978). See *Teague* v. *Lane,* 489 U.S. 288 (1989). The rule in *Commonwealth* v. *Rodriguez,* 370 Mass. 684 (1976), has also been applied to cases on collateral appeal for the same reason, so that even if the defendant's conviction had been affirmed before *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), had been decided, the conviction would have been just as susceptible to attack on collateral review as it is on direct review. *Connolly* v. *Commonwealth,* 377 Mass. 527 (1979). See *Amirault, supra* at 639-640. We did, however, note in *Stokes* that the trial judge lacked the guidance of *Mullaney* and *Rodriguez,* and we therefore would not review the instruction in cases tried before with the "greater expectations" and "more careful scrutiny" with which we would review instructions given after those cases. *Stokes, supra* at 591. Because this case was tried before *Mullaney,* we review it with this lesser scrutiny, but the charge must still meet the minimum due process requirements. In our review, we shall consider the charge to the jury as a whole, *id.,* and consider how a reasonable juror would have understood the charge to determine whether the constitutional requirements are met. *Commonwealth* v. *Zezima,* 387 Mass. 748, 751 (1982).

In this case, the judge's instructions began with a lengthy and accurate general description of the presumption of innocence and explanation that the Commonwealth bore the burden of proving that the defendant committed the alleged crime. The judge then described malice aforethought and discussed the differences between the degrees of murder and the difference between murder and manslaughter. The judge then reached self-defense: "It is further the posture of the case that [the defendant] . . . says that . . . the killing of

[the victim] was justified. He said it was excusable by reason of self-defense." He described self-defense not as negating an element of the offense, but as "an excuse and justification" for the killing. He then explained the elements of self-defense:

> "[T]o avail oneself of the defense of self-defense, *it must be that* the defendant had reasonable grounds to believe and actually did believe he was in imminent danger . . . from which danger he could save himself only by using deadly force . . .
>
> ". . .
>
> "Presupposing that *you were to find* that the defendant had reasonable grounds to believe he was in imminent danger . . . what . . . would be reasonable and what would be not excessive means of self-defense? This . . . you must determine.
>
> ". . .
>
> "*If you find* that the victim . . . did indeed come at the defendant with a knife and that the defendant had reasonable grounds and did believe that his life was seriously in danger, and that the defendant had taken all steps, . . . this act, then, is one done through the heat of blood or violence of anger, and is . . . , therefore, done not through malice. . . . *[I]f you so find,* the crime of killing is mitigated from murder to manslaughter by reason of the absence of the element of malice aforethought, *if you so find.*
>
> "*Now, if you believe the story of the defendant, if you believe the position that the defendant has adopted during the course of this trial,* after an analysis of all the testimony and all the circumstances — you must consider all of the circumstances in determining whether or not you are to *believe the story of the defendant.* . . . [Y]ou must consider whether or not, upon all the evidence, that the *Commonwealth has succeeded in convincing you beyond a reasonable doubt of the guilt of the defendant.*
>
> "Now, if, upon all the evidence and upon having

considered all the circumstances, . . . *if you find that* —
and . . . it's agreed that this young man, [the victim],
was killed and he was killed by this man, [the defen-
dant] — *if you believe that* under these circumstances,
. . . [the defendant] was acting in the exercise of his
right of self-defense . . . *if you feel all of those circum-
stances to be proved and you believe the story that the de-
fendant tells* . . . and *if you believe that* he reasonably
anticipated death, and that the force was reasonable
under the circumstances . . . then the killing of [the
victim] was excusable, and you shall acquit the defen-
dant." (Emphasis supplied.)

The charge continued to discuss all the possible verdicts and
what the jury would have to find to reach each of them. In
discussing scenarios in which the jury would find the defen-
dant guilty, the judge used similar terminology such as "find"
in discussing facts the Commonwealth must prove in order
for the jury to find the defendant guilty.

The charge to the jury did not explicitly state what the
burden of proof is for self-defense. We have stated that, in
pre-*Mullaney* cases, such an explicit statement is not required.
*Stokes, supra* at 591. In the absence of such an instruction
which clearly places the burden on the Commonwealth,
however, the conviction must be overturned where the
instruction read as a whole might lead a reasonable juror to
believe that the Commonwealth was not required to prove the
absence of self-defense beyond a reasonable doubt. *Id.* The
instructions first distinguish between the elements of the crime
and self-defense and describe self-defense as a claim that the
defendant "says" applies to justify the killing. This descrip-
tion of self-defense is not in error at all if there is a clear
statement that the Commonwealth bears the burden to
disprove self-defense, but where there is no such statement, to
distinguish self-defense as something the defendant is af-
firmatively claiming from the elements which the judge has
clearly placed the burden on the Commonwealth might have
left the jury confused as to which party bore the burden of
proof. See *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 691
(1976). "The greater difficulty with the charge lies in its
repeated use of 'finding' language when explaining the law of
self-defense." *Connolly* v. *Commonwealth,* 377 Mass. 527, 533

(1979). See *Rodriguez, supra* at 690 (repeated use of "find," statement that defendant seeking to "justify his actions," and statement that jury should find self-defense if "satisfied on the evidence" enough to render instructions improper). The repeated use of the word "find" in addition to the repeated statement that the jury should acquit based on self-defense if they "believe[d]" the defendant's story suggests that the jury must affirmatively believe the defendant and the defendant must convince the jury of the facts necessary to show self-defense by "at least a preponderance." *Connolly, supra* at 534. We note that the judge did, in the course of his instructions on self-defense, state that the jury "must consider whether or not, upon all the evidence, that the Commonwealth has succeeded in convincing you beyond a reasonable doubt of the guilt of the defendant." In the context, this statement, which did not specifically refer to self-defense, was insufficient to clarify the misimpression left by the rest of this instruction. "[W]hereas instructions using a terminology of burden of proof have a technical cast and may well be obscure to jurors, instructions telling the jury that they must find or be satisfied of a proposition . . . would readily convey to them in comprehensible lay terms that it was the defendant who was required to wield the laboring oar." *Connolly, supra* at 533-534.

The cases cited by the Commonwealth are distinguishable from the instant case. In *Gagne* v. *Commonwealth,* 375 Mass. 417 (1978), the judge did not give an explicit instruction on self-defense, but he clearly indicated that sufficient provocation would negate malice. "There was then an essentially neutral statement as to self-defense without language of 'finding'" or other such language which would suggest a shifting of the burden of proof. *Connolly, supra* at 537 (distinguishing *Gagne*). In *Lannon* v. *Commonwealth,* 379 Mass. 786, 790-792 (1980), we upheld the conviction despite the use of "finding" and other similar language. In that case, however, the defendant suggested the language used and most of it occurred in a section of the charge dealing with diminished responsibility. The diminished responsibility charge was not required at all because we had rejected the idea of diminished responsibil 'v, and therefore the charge given was more favorable to the defendant than required. Many of the remaining cases the Commonwealth cites, such as *Commonwealth* v. *Al-*

*bert,* 391 Mass. 853 (1984), and *Commonwealth* v. *Roberts,* 423 Mass. 17 (1996), were tried after *Rodriguez* so the offensive language is balanced by the *Rodriguez* charge which clearly establishes that the Commonwealth has the burden as to self-defense.

### III

Although we reverse the conviction based on the incorrect instructions on self-defense, we address several other issues on appeal which may reoccur if the Commonwealth chooses to retry the defendant.

At the trial, the prosecutor elicited testimony from the defendant that he had obtained a lawyer right away and had refused to give a statement on the advice of counsel. The Commonwealth then asked the defendant whether the law of self-defense was explained to him. The defendant admitted that he was told the requirements of the law of self-defense, and the prosecutor used that information to argue that the defendant had exactly conformed his story to the law of self-defense, even using specific language to describe the killing such as "back against the wall" which was commonly used in jury instructions at that time.

The defendant has a right in the face of questioning by the police to remain silent and request counsel, see the Fifth and Sixth Amendments to the United States Constitution, and that right includes the right not to be penalized for exercising those rights. See *Doyle* v. *Ohio,* 426 U.S. 610, 617-619 (1976) (post-*Miranda* [*Miranda* v. *Arizona,* 384 U.S. 436 (1966)] silence may not be used against the defendant); *United States* v. *Daoud,* 741 F.2d 478, 480 (1st Cir. 1984) (extending *Doyle* to requests for counsel). Similarly, in *Commonwealth* v. *Person,* 400 Mass. 136, 138-143 (1987), we granted a new trial where the prosecutor argued that the defendant, who had not made a statement prior to trial, sat through the prosecutor's presentation at trial and then fabricated a story that countered every detail in the prosecution's theory of the case. We concluded that the defendant had a right to remain silent, to hear the evidence against him, and then confront the prosecution's witnesses in order to rebut them. We concluded that to use against the defendant his strategy to wait until after the prosecution had made its case before revealing his story would disparage the constitutional rights

which allowed him that strategy. As applied to the facts here, the prosecutor may, of course, impugn the defendant's credibility and argue that his story is a fabrication, see, e.g., *Commonwealth* v. *Cohen*, 412 Mass. 375, 388 (1992). The cases cited above, however, hold that the prosecutor may not elicit evidence of the defendant's silence, his request for an attorney, or the discussions the defendant had with his attorney to argue that these were evidence that the defendant fabricated his story.

The defendant further objects to the prosecutor's suggestion to the jury that "[y]ou take a look . . . at that dent in the wall, and if you think it was caused by a bump, I would ask you to try to do the same thing on the wall up in the jury room." Although we agree with the Commonwealth that such a statement was meant rhetorically and was not likely to induce the jury actually to conduct such an experiment, the prosecutor should not encourage the jury to conduct experiments or to obtain outside information of any sort. See *Commonwealth* v. *Cuffie*, 414 Mass. 632, 636-638 (1993).

The defendant claims in this appeal that his lawyer was ineffective for not objecting to the admission of certain evidence at trial. At a second trial issues whether this evidence should be excluded under the Fourth Amendment to the United States Constitution are likely to arise. The killing occurred before the Supreme Court's decision in *Mincey* v. *Arizona*, 437 U.S. 385, 393-395 (1978), which made it clear that there is no "murder scene exception" to the warrant requirement. See *Commonwealth* v. *Lewin (No. 1)*, 407 Mass. 617, 621-627 (1990). As a consequence, the police in this case conducted an extensive search of the apartment after the defendant was taken to be booked without realizing the necessity of a warrant. Certain key items such as the gun, the butcher knife, and spent shells were found in plain view by the officers when they arrived on the scene. The defendant does not object to the admission of these items, and their seizure is justified by *Chimel* v. *California*, 395 U.S. 752, 763 (1969) (allows search incident to arrest in the area immediately around the arrestee), and *Mincey* v. *Arizona, supra* (allows protective sweep looking for other victims or the killer at a murder scene and the seizure of any items in plain view incident to that search). Any other items which were properly discovered in the course of the officers' arrival at the

scene and arrest of the defendant may be properly introduced as well as the observations of the officers made at that time. Once the defendant was removed from the apartment, any exigency ended, and the police were required to obtain a warrant. *Id.* Thus, the projectiles and the pictures taken later that evening as well as observations by officers arriving at the scene later that evening could be excluded at the request of the defendant.[4]

Accordingly, the judgment is reversed, the verdict is set aside, and the case is remanded for a new trial.

*Judgment reversed.*

---

[4]At the trial, much of what the defendant now objects to was elicited by his own counsel. Defense counsel may choose as a reasonable tactical decision not to object to the introduction of some or all of this and may introduce such evidence himself to bolster the defendant's own story.