## COMMONWEALTH *vs.* MELVIN B. EWING.

No. 05-P-442.

Barnstable. April 5, 2006. - October 6, 2006.

Present: LENK, SMITH, & GRAHAM, JJ.

Further appellate review granted, 447 Mass. 1113 (2006).

*Rape. Evidence,* Threat. *Deoxyribonucleic Acid. Practice, Criminal,* Cross-examination by prosecutor, Argument by prosecutor.

At the trial of an indictment charging rape, the evidence was sufficient to convict the defendant on the ground of threat of bodily injury, where the defendant's conduct of physically overpowering the complainant in her own bedroom and forcing her onto the bed implied a threat of bodily harm if she did not submit to his demands, and where the complainant's view of the conduct as threatening was shown by her pleas during the incident not to harm her or her children and by her fear that her life would be in danger if she could identify her assailant. [537-539]

A Superior Court judge properly denied the criminal defendant's motion to suppress deoxyribonucleic acid (DNA) evidence obtained by police officers, where the defendant had no expectation of privacy in cigarette butts that he abandoned as trash, and where the officers' tactic of offering the defendant a meal, a drink, and cigarettes while questioning him on an unrelated matter was not an illegal ruse. [539-541]

At a criminal trial, a substantial risk of a miscarriage of justice requiring a new trial arose where the prosecutor, in her cross-examination of the defendant, invited the jury to draw the inference that the defendant had used his access to the Commonwealth's evidence before trial to conform his testimony falsely to fit the evidence against him [541-542], and where the prosecutor, in her questions during cross-examination of the defendant and in comments in her closing argument, urged the jury to discredit the defendant's testimony because he did not seek out the police prior to trial to report his exculpatory version of the incident in question, and the judge failed to advise the jury that closing arguments are not evidence [543-545].

INDICTMENT found and returned in the Superior Court Department on August 20, 2002.

A pretrial motion to suppress evidence was heard by *Gary A. Nickerson*, J., and the case was tried before *Richard F. Connon*, J.

*Aziz Safar* for the defendant.

*J. Thomas Kirkman*, Assistant District Attorney, for the Commonwealth.

SMITH, J. After a jury trial in the Superior Court, the defendant was convicted of the charge of rape. On appeal, the defendant argues that (1) the evidence was insufficient to sustain the rape conviction on the ground of threat of bodily injury; (2) trial counsel was ineffective for failing to object to certain evidence[1]; (3) the prosecutor's cross-examination of the defendant and her closing argument improperly challenged the defendant's right to prepare for trial and to remain silent; (4) the prosecutor misstated facts in her closing argument; and (5) the motion judge improperly denied the defendant's motion to suppress deoxyribonucleic acid (DNA) evidence.

*Facts.* We summarize the evidence in the light most favorable to the Commonwealth, reserving further details for the discussion of specific issues. In 1995, the complainant was living in a single-family home in Centerville with her two children, a four year old son and a two year old daughter. She had lived there for less than one year. About two years earlier, the complainant had divorced her husband, the father of her children.

On Friday, January 13, 1995, the complainant awoke shortly after 5:00 A.M., as was her custom, to prepare for work and to get her children ready for day care. After showering, the complainant put on her bathrobe and began to apply her makeup as she sat on the edge of her bed. Her son entered the room and the complainant told him to go back to bed until he heard her hair dryer go off, a signal that the two had established to show that she was dressed and ready to turn her attention to him. A few minutes later, the complainant saw the door knob turning and, thinking it was her son again, got up and pushed the door closed. When she saw the handle turning a third time, the complainant became a little angry and went to the door and swung it open, prepared to reprimand her son.

Standing there was a black man, whom the complainant testified she had never seen before. She described him as being light skinned, about five feet, eight inches tall, with a small build, and wearing dark clothes. Because of his position at the

---

[1]Appellate counsel for the Commonwealth and for the defendant were not trial counsel in this matter.

bedroom door, with his back toward her daughter's bedroom rather than toward the hallway that led to the main part of the house,[2] the complainant inferred that he had come from her daughter's room. He immediately covered the complainant's mouth with his hand, turned her around, and pushed her back into the bedroom. At the same time, he covered her eyes with a scarf or bandana, which prevented her from seeing. The man shoved the complainant onto the bed so that she landed on her back with her legs hanging off of the side. She told him to shut the door so her son would not see what was about to happen. He complied without saying anything.

The man opened the complainant's bathrobe and penetrated her vaginally with his penis. She asked him not to hurt her or her children. Hoping that he would stop, she also told him that she had less than one year to live because she had melanoma, a form of cancer. The man did not stop but moved his penis toward her face. The complainant turned her head to the side and said, "Please, don't," and he moved his penis downward and again penetrated her vagina.

The complainant then heard the intruder fumbling with the light switch, as though he was turning it off, and then she felt him begin to untie the blindfold. Because she still was afraid that he was going to hurt her or her children and that the risk of harm would increase if she saw his face, she asked him to leave on the blindfold. He took the blindfold off and the room was dark. As the man was getting dressed, he called the complainant by her first name and said, "You won't say anything about this to anyone." It was difficult for the complainant to hear when the man left her home, but after she was reasonably sure that he had left, she checked on the children and called her former husband and the police. Her former husband received the complainant's telephone call at about 5:45 A.M.; she was screaming into the telephone that she had been raped. He described her voice as hysterical and frightened. He immediately drove to the complainant's home, and arrived about fifteen minutes after receiving the telephone call. The police already were there. He found the complainant crying, distraught, and very shaken.

[2]The son and the daughter slept in bedrooms that adjoined the complainant's bedroom.

Sergeant Michael Damery and Officer Sean Roycroft, two of the first Barnstable police officers to arrive at the scene, similarly described the complainant's demeanor.

The police spoke to the complainant and checked the home for the point of entry of her assailant and any evidence of the crime. Roycroft saw and picked up a pair of men's underwear off of the floor of the complainant's bedroom. It first appeared to the complainant and to the police that the assailant may have possessed a key because they did not detect any sign of a forced entry and the deadbolt lock on the front door, which had been secured the night before, was unlocked and appeared undamaged. The complainant was sure she had locked the front door the night before because jewelry had been stolen from her home only six days earlier. The complainant was taken to the hospital by ambulance where she was examined and evidence was collected in a rape kit.[3]

The complainant's former husband remained behind to take care of the children. He inspected the home, looking for the way the assailant may have entered the house. In his daughter's room he noticed some dirt on the bed that was directly underneath the window and what appeared to be a hand print or fingerprints on the outside of the window.[4] He also noticed that the window appeared to be open a little and unlocked, in contrast to the other windows in the house, which were locked. He summoned the police back to the home and showed them what he had found. The type of lock on the window, a clamshell-type hasp, was described as the least reliable type of lock because vibrations in the home can cause it to become unsecured. Detective Edward Campbell examined the exterior of the window and was able to lift two fingerprints from the aluminum frame, where it curved over the glass. Campbell testified that the cold and damp weather conditions that existed at that time quickly deteriorate such evidence and therefore the good quality of the fingerprints and the way the testing powder reacted with the prints suggested, according to Campbell, that

---

[3]After returning from the hospital, the complainant moved out of the house and never returned.

[4]At that time, there was also a crib in the room, away from the window, where the complainant's daughter slept.

the prints had been put on the window frame within hours of the test having been conducted.

Once the likely point of entry was discovered, a police dog trained to track human scent was brought to the scene. The dog picked up a scent just below the window where the fingerprints had been recovered and followed it across the complainant's backyard, through an opening in her back fence, and into the backyard of 241 Pine Street, the house directly behind the complainant's home. The defendant lived there with his parents and his sister. His bedroom was on the second floor and had a view of the complainant's home and her backyard.

The dog stopped at the side door of the defendant's house, prompting the police to knock on the door. A woman answered the door and the police explained that there had been a breaking and entering about one hundred yards away, forty to sixty minutes earlier. They asked her permission to check the house for her safety. The woman acknowledged that there were other people in the house but would not identify them and refused entry to the police.

On January 19, 1995, six days after the rape, Detective Nancy Blanchard interviewed the defendant at the police station.[5] Blanchard asked the defendant if he had heard about the rape that had taken place and he stated that he was not aware of it. Blanchard asked him where he had been during the period in question and the defendant said he had been out the previous evening and had arrived home at 241 Pine Street at 2:00 A.M. In response to further questioning, the defendant supplied Blanchard with the names of the people who had accompanied him that evening. At the time of the interview, the defendant was about five feet, seven inches tall and weighed approximately 150 pounds.

In February, 1995, the fingerprints from the window were submitted to a law enforcement computer database, without any matching results. The case lay dormant until July, 2001, when one Ricardo Daniels, who was in jail awaiting trial, sent a letter to the police informing them that he had some information about the defendant that he would be willing to exchange for

---

[5]Although the jury was not informed of this fact, it is clear from a discussion at sidebar that the defendant was under arrest for an unrelated incident at the time of the interview.

leniency on his pending charges. State Trooper Richard Cos-
grove spoke to Daniels, a boyhood friend of the defendant.
Based on the information Daniels provided,[6] Cosgrove requested
that the fingerprints taken from the complainant's home at the
time of the incident be compared with a standard set of the
defendant's fingerprints to which the police had access. When it
was determined that one of the lifted prints matched the
defendant's right ring fingerprint, the police retrieved the rape
kit for the purpose of matching its contents with the defendant's
DNA.[7] The defendant's DNA matched the DNA detected on a
vaginal swab taken from the complainant at the hospital.

The theory of the defense was that the defendant had been
acquainted with the complainant, had been having an affair with
her, and that they had engaged in consensual intercourse in the
early morning hours of January 13, 1995. The defendant testi-
fied that he lived in his parents' home and met the complainant
in the fall of 1994. They had engaged in consensual sexual
intercourse on three separate occasions, including the morning
of January 13. The defendant stated that the relationship had
been a secret one at the request of the complainant because she
did not want people to know that she was involved with a man
who was fourteen years younger than her.

The defendant also testified that he went to the complainant's
home unexpectedly on the evening of January 12 and told her
he was going out in Boston and would not return until later.
The complainant gave him a key so that when he returned, he
could let himself into her home. When he returned at 2:00 A.M.,
using the key, he let himself in, and went to the complainant's
room where they engaged in consensual sex.

The defendant stated that on that occasion, he implored the
complainant to "be open" about their relationship and to tell
others about it. When the complainant disagreed, the defendant
testified he had become angry and had threatened to tell the

---

[6]At trial, Daniels testified that sometime around the time of the rape, he
was with the defendant in the defendant's bedroom. The defendant told him
that he had broken into the house behind his mother's home and had stolen
some jewelry. He showed the jewelry to Daniels. The defendant also told
Daniels that a "very pretty woman" lived in the house.

[7]The manner by which the police obtained the defendant's DNA is discussed
later in this opinion.

complainant's former husband and the Department of Social Services that she was allowing him to sell drugs from her basement. According to the defendant, he stashed marijuana, which he sold elsewhere, in the bulkhead leading to the complainant's basement. The defendant also claimed to have left his underwear in her bedroom in the hope that the complainant's former husband would find it and confront her about it, forcing her to disclose the relationship.

The defendant further testified that the first time he learned that the complainant had stated that she had been raped was when he was questioned on January 19, 1995, by Detective Blanchard. The defendant denied at trial that he ever had talked about the complainant with Daniels or had told him that he had broken into the complainant's home and had stolen jewelry.[8] The defendant's mother testified that on one occasion she had seen him talking to the complainant at the fence that separated their backyards.

We now discuss the issues raised by the defendant.

1. *Sufficiency of the evidence.* The crime of rape requires proof of "sexual intercourse with another compelled by force and against the [complainant's] will or compelled by threat of bodily injury." *Commonwealth* v. *Sherry*, 386 Mass. 682, 687 (1982), citing G. L. c. 265, § 22(*a*), (*b*). The judge instructed the jury on both theories and the jury returned a general verdict. In order to sustain the verdict in these circumstances, the evidence must be sufficient to sustain both theories of proof. See *Commonwealth* v. *Plunkett*, 422 Mass. 634, 635 (1996).

According to the defendant, the evidence was insufficient to show rape by threat of bodily harm and it is impossible to determine if the verdict was based on the wrong theory.[9] In support of his argument, the defendant relies on the complainant's

---

[8] Daniels testified in rebuttal and repeated the testimony he had given as part of the Commonwealth's case.

The complainant also testified as a rebuttal witness and denied that she ever had engaged in consensual sexual intercourse with the defendant. She also stated she did not have any knowledge of marijuana allegedly being stored in her bulkhead or any knowledge that the defendant, whom she did not know, claimed to have been selling marijuana from her home.

[9] The defendant, in his brief, impliedly conceded that the evidence was sufficient to prove rape by force.

testimony that the defendant threatened neither her nor her children in order to compel her to engage in sexual intercourse. His argument, however, is based on the erroneous assumption that only explicit threats are sufficient to prove the threat element of the offense.

The term "threat," as it appears in the rape statute, does not distinguish between implied or expressed threats, but only requires that the threat "engender[] fear 'reasonable in the circumstances . . . so that it was reasonable for [the complainant] not to resist.' " *Commonwealth* v. *Sherry*, 386 Mass. at 696. See *Commonwealth* v. *Gittens*, 55 Mass. App. Ct. 148, 153 (2002) ("The word 'threat,' without modification, has been held to encompass implied as well as express threats in interpretations of other statutes containing the word").

Here, the complainant testified that when she opened her bedroom door and saw a man standing there, she was in "shock" as he covered her mouth with his hand and then her eyes with a blindfold and forced her onto the bed. As the man penetrated her the first time, the complainant testified that she was afraid he was going to hurt her or her children. She acted on this fear by asking her assailant not to harm her or her children, and in an attempt to persuade him to stop, she told him she had terminal cancer. Her fear continued, unabated, as evidenced by her plea not to remove her blindfold which she claimed she uttered in order to protect her life.

The assailant's conduct of physically overpowering the complainant in her own bedroom and forcing her onto the bed implied a threat of bodily harm if she did not submit to his demands. The complainant clearly viewed the assailant's conduct as threatening as shown by her pleas during the incident not to hurt her or her children and her continuing fear at the end of the incident when she indicated that she thought her life would be in danger if she saw her assailant's face. Together, these facts demonstrate that the force the assailant used during the incident to obtain the complainant's submission also conveyed an implied threat of bodily injury if she did not submit.

The defendant's reliance on *Commonwealth* v. *Eldridge*, 28 Mass. App. Ct. 936, 937 (1990), for the contrary conclusion is

misplaced. In *Eldridge*, the complainant was a brain-damaged twenty-two year old man who was raped by his roommate, also a brain-damaged young man, during a stay at a temporary residence for mentally retarded and disabled persons. *Id.* at 936. The defendant, who had shown the complainant pornographic magazines earlier in the evening, woke the complainant after he had fallen asleep and told him to kneel and lie on the floor while the defendant put his penis in the complainant's mouth and rectum. *Ibid.* In addition to "force" grounds, the Commonwealth proceeded on "threat" grounds on the sole basis that the complainant reported that the defendant had threatened to kill him with a knife. *Id.* at 936-937. The complainant's trial testimony was equivocal regarding whether the threat occurred sometime after the incident and whether the defendant even threatened the complainant with a knife. *Id.* at 937. Because the Commonwealth's threat theory related solely to evidence of an explicit threat, the *Eldridge* court only evaluated whether that evidence was sufficient. The ruling that the evidence was insufficient has little bearing in this matter where the evidence showed that a stranger attacked the complainant in her home and compelled her to submit by physical force and the implied threat of bodily injury.

2. *Denial of the defendant's motion to suppress DNA evidence.* The defendant filed a motion to suppress DNA evidence because, he alleged, his DNA was obtained improperly by the Barnstable police. A judge, not the trial judge, denied the motion, and the defendant claims error.

We summarize the facts found by the motion judge. After the police were informed that the defendant's fingerprint matched the fingerprint on the window, the defendant was arrested by the Barnstable police on an arrest warrant for a charge of assault and battery by means of a dangerous weapon, a charge not related to this matter.

Two detectives decided to further the rape investigation and to obtain the defendant's DNA in order to match it with the DNA taken from the 1995 vaginal swab. Over the next forty-five minutes, while the defendant was being interviewed about the assault and battery incident, he was provided with a meal, a soft drink, and a straw, and he smoked three cigarettes furnished

by the police. When the interview concluded, the defendant was taken to his cell and held on the warrant. When he left the interview room, the defendant made no attempt to take his meal, his drink, or the remainder of his cigarettes with him.

Once the defendant left, one of the detectives seized the straw and the cigarette butts and submitted them to the State police crime laboratory for testing. The DNA recovered from one of the cigarette butts matched the DNA recovered from the seminal fluid found on the 1995 vaginal swab. The motion judge ruled that the items seized by the police were abandoned by the defendant and that although the police used a ruse to obtain the items, it was not a violation of the defendant's constitutional rights.

There is no merit to the defendant's initial claim that he had an expectation of privacy in the cigarette butts and that the police required a warrant to seize them. The defendant had no expectation of privacy in cigarette butts that he voluntarily abandoned as trash. See *Commonwealth* v. *Pratt*, 407 Mass. 647, 660 (1990) (the defendant "abandoned his privacy interests in his garbage through the placement of his trash bags at the curb for collection"); *Commonwealth* v. *Rice*, 441 Mass. 291, 295-296 (2004) (any rights the inmate may have enjoyed in his T-shirt or his bed sheets were abandoned "when he surrendered [the T-shirt] for a replacement" and the sheets for laundering). Thus, no warrant to seize the cigarette butts was required.

Similarly unavailing is the defendant's contention that the evidence must be suppressed because it was the product of an illegal ruse. Regardless of whether we agree with the motion judge's conclusion that the police engaged in a ruse, the police did not engage in misconduct. "The police have been permitted to employ a ruse [even] to gain entry into a [person's] home in certain situations." *Commonwealth* v. *Villar*, 40 Mass. App. Ct. 742, 745 (1996). Here, the defendant was offered a meal and invited to smoke several cigarettes. He accepted the meal and the cigarettes, and abandoned what remained when he finished. There was no evidence of coercion. Under the circumstances, the ruse, if it was one, was proper.

The defendant's claim that the evidence should have been suppressed because it was seized during a pretextual search is

misplaced. The defendant was not in custody on a pretext; therefore, the doctrine is inapplicable. See, e.g., *United States* v. *Guzman*, 864 F.2d 1512, 1515 (10th Cir. 1988) ("A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop"); *Commonwealth* v. *Santana*, 420 Mass. 205, 209 (1995), quoting from *United States* v. *Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989), cert. denied sub nom. *Cummins* v. *United States*, 502 U.S. 962 (1991) (stop deemed valid because police were "doing no more than they [were] legally permitted and objectively authorized to do").

The defendant's motion to suppress properly was denied.

3. *Prosecutor's cross-examination and closing argument.* On appeal, the defendant argues for the first time that the prosecutor's cross-examination of the defendant and her closing argument challenged the defendant's right to prepare for, and be present at, his trial, citing *Commonwealth* v. *Person*, 400 Mass. 136, 139-142 (1987), and also the defendant's right to postarrest silence, citing *Doyle* v. *Ohio*, 426 U.S. 610, 618 (1976).

a. *The* Person *issue.* During the cross-examination of the defendant, the prosecutor obtained an acknowledgment from him that, prior to trial, the defendant had reviewed the discovery material that defense counsel had received from the Commonwealth. Those materials included the complainant's statements in the police reports, the DNA results, and, in essence, all of the facts of the Commonwealth's case. There was no objection to the line of questions. The prosecutor did not make any mention in her closing argument that the defendant was aware of the Commonwealth's case prior to trial.

The defendant claims that the prosecutor's questions concerning the defendant's knowledge of the Commonwealth's case, knowledge that he had obtained prior to trial, was error because it challenged the defendant's right to prepare for trial. In *Commonwealth* v. *Person*, *supra*, the court granted a new trial because the prosecutor in his closing argument told the jury that the defendant, who had not made a statement prior to trial, sat through the presentation of the Commonwealth's evidence at

trial, took the stand, and fabricated a cover story tailored to answer every detail of the evidence against him. The court held that the defendant had a right (a) not to make a statement prior to trial, and (b) to hear the evidence against him and confront the prosecutor's witnesses in order to rebut them. See *id.* at 140-142; *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997). The *Beauchamp* court concluded that "to use against the defendant his strategy to wait until after the prosecutor had made its case before revealing his story would disparage the constitutional rights which allowed him that strategy." *Commonwealth* v. *Beauchamp*, *supra*. See *Commonwealth* v. *Person*, *supra* at 139-141.

Here, the prosecutor's line of questioning focused on the defendant's knowledge of the Commonwealth's evidence that he had obtained prior to trial, not knowledge that the defendant gained by his presence at trial and by listening to the Commonwealth's witnesses. Contrast *id.* at 138-139. Clearly, the defendant's trial strategy was not formed after listening to the Commonwealth's evidence.[10] And, unlike the prosecutor in *Person*, the prosecutor in this matter did not make any reference in her closing argument to the defendant's pretrial knowledge of the Commonwealth's case.

It is fundamental, however, that a defendant has a right to prepare for trial; such preparation may include material furnished by the Commonwealth as required by Mass.R.Crim.P. 14(a)(1), as appearing in 442 Mass. 1518 (2004), including statements of Commonwealth witnesses, Mass.R.Crim.P. 14(a)(1)(A)(vii), and expert opinion evidence, Mass.R.Crim.P. 14(a)(1)(A)(vi). We think it is error for a prosecutor to invite the jury to draw the inference that the defendant had used his access to the Commonwealth's evidence before trial to conform his testimony falsely to fit the evidence against him. *Commonwealth* v. *Jones*, 45 Mass. App. Ct. 254, 256-257 (1998).

---

[10]For example, defense counsel's opening statement, given prior to the start of the Commonwealth's case, outlined the aspects of the trial strategy, i.e., that the intercourse was consensual. In addition, a stipulation was read to the jury, at the start of the trial, that stated that the defendant admitted that he had engaged in sexual intercourse with the complainant on January 13, 1995, but his defense would be that the complainant consented.

b. *The postarrest silence issue.* During her cross-examination of the defendant, the prosecutor, without objection, asked the following questions:

> PROSECUTOR: "Well, in 2001, you were arrested for rape, true?"
>
> DEFENDANT: "That is true."
>
> PROSECUTOR: "And these charges have been pending ever since?"
>
> DEFENDANT: "Exactly."
>
> PROSECUTOR: "And at no time have you reached out to anyone from the Barnstable police department to explain your side of the story, that it's all a big misunderstanding?"
>
> DEFENDANT: "No, I figured I would come to trial and do that."

The prosecutor, in her closing argument, again without objection, stated:

> "And in 2001, when the defendant was finally charged with this offense, why didn't he go to the Barnstable police and explain his version of the events? That this was an old spurned lover who had filed a report years before and certainly she wouldn't want to go forward since they now hadn't seen each other in years and certainly any animosity she may have had for him in 1995 had waned. But yet he didn't."

On appeal, the defendant contends that the remarks violated his right to pretrial silence and trivialized his defense. He cites *Doyle* v. *Ohio*, 426 U.S. at 616-618, in support of his argument.

The defendant's reliance on *Doyle* is misplaced. In that decision, the United States Supreme Court held, *id.* at 617-618, that the due process clause forbids the use by the prosecution of a defendant's post-Miranda silence for the purpose of impeaching an exculpatory story advanced at trial by a defendant. The Court reasoned that the defendant's "[s]ilence in the wake of [Miranda]

warnings may be nothing more than the arrestee's exercise of these Miranda rights" and, therefore, it would be "fundamentally unfair" to permit the government to use that silence against the defendant. *Id.* at 617, 618.

Here, there was no evidence that the defendant, either before or after his arrest, was given Miranda warnings and elected to remain silent. Absent proof of such facts, *Doyle* simply has no application to this matter.

Our analysis does not stop here. Long before *Miranda* v. *Arizona*, 384 U.S. 436 (1966), was decided, it was held that a defendant who is in custody has a right to remain silent. *Commonwealth* v. *Kenney*, 12 Met. 235, 237-238 (1847). The rule that a defendant has a constitutional right to remain silent at his arrest and while in custody is "so fundamental as to require little elaboration." *Commonwealth* v. *Bennett*, 2 Mass. App. Ct. 575, 578-579 (1974), citing Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694-695 & n.15 (1983); *Commonwealth* v. *Adams*, 434 Mass. 805, 811 (2001); *Commonwealth* v. *Andujar*, 57 Mass. App. Ct. 529, 536 (2003). "Impermissible comment upon a defendant's right to remain silent is 'so egregious that reversal is the norm, not the exception.' " *Id.* at 537, quoting from *Commonwealth* v. *King*, 34 Mass. App. Ct. 466, 469 (1993).

Here, it is clear from the questions asked of the defendant on cross-examination, and from remarks in closing argument, that the prosecutor was urging the jury to discredit the defendant's testimony because he did not seek out the police prior to trial to report his exculpatory version of the incident. This was error.

Because there was no objection to either the cross-examination or the closing argument, we consider whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987). A substantial risk of a miscarriage of justice exists "if we have a serious doubt whether the result of the trial might have been different had the error not been made." *Commonwealth* v. *Acevedo*, 446 Mass. 435, 450 (2006), quoting from *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).

The trial in this case presented a duel of credibility, with the complainant's version of the incident being bolstered by evidence of the defendant's fingerprint on the window frame and evidence of the dog tracking a scent to the defendant's home. In *Commonwealth* v. *Mahdi, supra* at 694-698, the court held that the district attorney's questions to a witness concerning the defendant's invocation of his right to silence, and the district attorney's subsequent use of the defendant's postarrest silence in closing argument, constituted harmful error. The evidence against the defendant was strong. The court noted, however, that "[t]he weight of the evidence alone is not sufficient . . . to make the district attorney's comments harmless error." *Id.* at 698. See *Commonwealth* v. *Andujar, supra.*

Here, the impermissible questions and comments went directly to the heart of the defendant's defense, i.e., that his version of events, and not the complainant's, should be believed.[11] Furthermore, the error was compounded by the failure of the judge to cure the error in his instructions to the jury. We recognize that the judge was not asked to give a curative instruction relative to the prosecutor's error, but here, the judge never informed the jury explicitly that closing arguments of counsel are not evidence.[12] "Thus, the prejudicial effects of the testimony, and of the prosecutor's remarks in her closing argument, reached the jury with full force and without the potentially countervailing influence of prompt and forceful cautionary instructions by the judge." *Commonwealth* v. *Cobb,* 374 Mass. 514, 521 (1978).

*Conclusion.* We recognize that no defendant is entitled to a perfect trial, but we also recognize that every defendant is entitled to a fair trial. *Commonwealth* v. *Lodge,* 431 Mass. 461, 476 (2000). Here, the egregious conduct of the prosecutor deprived the defendant of a fair trial.

---

[11]A question from the jury — "At any time since the alleged rape could [the complainant] have dropped the charges?" — shows that they were focused on the improper portion of the testimony. See *Commonwealth* v. *Acevedo,* 446 Mass. 435, 450 (2006) (jury question indicated their focus on mitigating factors; ineffective assistance to fail to request provocation instruction). The judge answered the question by telling the jury it was an improper consideration.

[12]The judge did tell the jury, "So as judges of the facts in this case, listen to what the lawyers have to say in their final arguments."

We hold that the cumulative errors of the prosecutor's improper cross-examination of the defendant concerning his access to discovery prior to trial and her questions and comments in her closing argument, coupled with the judge's failure to advise the jury that closing arguments are not evidence, created a substantial risk of a miscarriage of justice. Therefore, there must be a new trial.[13]

*Judgment reversed.*

*Verdict set aside.*

*Remanded for a new trial.*

---

[13]To the extent we do not discuss arguments made by the defendant, they "have not been overlooked. We find nothing in them that requires discussion." *Commonwealth* v. *Domenski*, 332 Mass. 66, 78 (1954).