[Cite as *State v. Bortree*, 2021-Ohio-2873.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 8-20-67

    v.

RALPH E. BORTREE,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 19 08 0261

Judgment Affirmed

Date of Decision: August 23, 2021

APPEARANCES:

    *James P. Tyack and Holly B. Cline* for Appellant

    *Eric C. Stewart* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Ralph E. Bortree ("Bortree"), brings this appeal from the December 21, 2020, judgment of the Logan County Common Pleas Court sentencing him to 11 years in prison after Bortree was convicted by a jury of attempted aggravated murder in violation of R.C. 2923.02(A) and R.C. 2903.01(B), a first degree felony. On appeal, Bortree assigns error to several pretrial rulings by the trial court in addition to arguing that there was insufficient evidence presented to support his conviction, and that his conviction was against the manifest weight of the evidence.

*Background*

{¶2} On July 30, 1993, Anita C. left the Quincy home where she lived with her parents around 10 p.m. to run errands before her third-shift job at a plastic injection molding company. She had started at the company the year prior after graduating from high school. Once Anita was on her way to work, an individual in a truck drove around her, stopped in front of her and blocked her path, forcing her to stop her vehicle. A man Anita did not know got out of the truck and pointed a revolver at her, telling her to pull her car over or he would put a "hole" in her. Anita complied and pulled her car off the road. The man then took Anita's keys and threw them in the grass. Afterward the man told Anita to get in his truck and stay down on the floorboards. According to Anita the truck was a red Ford Lariat XLT with a

license plate beginning with the letters "NM." She also indicated the truck was a manual transmission.

{¶3} The man drove around for a while with Anita on the floorboards and he stopped in a wooded area Anita did not recognize. At that time the man got out and came to the passenger side of the vehicle and told Anita to take her clothes off. Anita complied. The man then started "touching" Anita, and he put his mouth on her breasts and her "private areas." Next, the man got into the truck and told Anita to perform oral sex on him. Anita did so, and the man ejaculated in her mouth. Anita opened the door and spit it out and wiped her mouth on her shirt.

{¶4} Anita was then allowed to put her clothes back on. The man drove around rural areas for some time until he stated he had to urinate. He stopped near another wooded area and came around to the passenger side of the truck and had Anita get out. Anita indicated that the man came up behind her and that he then cut her throat with a knife and shoved her over into the ditch.[1]

{¶5} Anita played dead until the man left. After the man was gone, Anita got up and started looking for help until she saw the man's truck coming back up the road. She hid until he passed. Afterward she went toward the first houses she could find, unfortunately getting caught in barbed wire at one point. Finally she made it to a house and a woman answered the door. The woman aided Anita and

---

[1] Anita saw the man wearing a sheath for a hunting-style knife but she never saw the knife itself.

911 was called. The woman stated that the cut on Anita's throat was the biggest cut she had ever seen.

{¶6} Anita was then taken to the hospital where her wounds were treated. An emergency room doctor indicated that Anita's neck was cut with an extremely sharp blade and her carotid artery was just narrowly missed by the cut. In fact, the doctor stated he could actually see the carotid artery in its "sheath." Multiple layers, including muscle, had to be stitched and closed, leaving Anita with a life-long scar on her neck. The cut was approximately three inches long and a half-inch deep. The doctor indicated that if Anita's carotid artery had been cut, she would have bled-out quickly.

{¶7} While Anita was at the hospital, a rape kit was performed. Anita's clothes were collected and oral swabs were taken. No vaginal swabs were collected. Anita also spoke with police, giving them a description of the man as roughly 5'7" or 5'8" tall. She said the man was in his late twenties or early thirties, kind of stocky with short brown hair that was a little longer in the back. She described the man as having a moustache, wearing shorts, a t-shirt, and a baseball hat. Anita worked with a sketch artist to produce a sketch of the man. She also provided what she recalled about the man's truck, including the first two letters of the license plate.

{¶8} The matter was investigated by law enforcement. Voluminous records were collected, which included all vehicles in the state and local areas that had

license plates beginning with the letters "NM." This totaled approximately 800 pages of vehicles with numerous listings on each page. Law enforcement also investigated possible ex-boyfriends and people at Anita's workplace, among others. DNA testing was in its infancy at the time, so there was blood-type testing done from the clothes and swabs that were collected. Comparisons were made to one potential suspect but he was excluded based on his blood type.

{¶9} Years passed with law enforcement unable to secure a viable suspect and there was no new information on the case. In 2004 DNA was again sent out for testing but the testing was unsuccessful.

{¶10} In 2014, a Logan County Sheriff's Deputy began looking into cold cases and he contacted BCI to see if advancements in DNA could now extract a profile of the individual who had assaulted Anita. This had not been possible in the past based on the small amount of DNA present. While nothing could be done in 2014, in 2015 technology had advanced to a point where BCI could extract a profile of the individual from the semen/saliva mixture left on Anita's shirt where she wiped her mouth after the encounter. Once this was done, the assailant's DNA profile was loaded into the CODIS database.[2] While there was not a match to a known individual, the DNA profile was a match to another as-yet unidentified assailant from a 1992 rape in Sidney, Ohio.

---

[2] CODIS stands for "Combined DNA Index System."

{¶11} The 1992 case involved a similarly-aged girl named Sheila who was walking home from work one night in Sidney when a stranger drove by and stopped, pointed a gun at her, and told her to get in the trunk of the car he was driving. The man drove Sheila around for quite some time until he let her out of the trunk in a rural area near some railroad tracks. The man told Sheila to take off her clothes, then had her perform oral sex on him. While attempting to leave the scene with Sheila, the man's car got stuck near the railroad tracks and he spent a significant amount of time trying to get it out. The vehicle was seen by railroad employees who passed on a train. Eventually the man got the car out and he drove back toward Sidney with Sheila in the car. He let her out of the car, told her not to look at him, then drove off.

{¶12} Since the assailant in both cases was unknown in 2015, and since BCI/law enforcement had no suspects to test the newly extracted DNA profile against, law enforcement again hit a roadblock. However, as technology advanced and changed, law enforcement became aware of "forensic genetic genealogy," whereby it was possible to identify investigatory leads through family genes that had been publicly uploaded to genealogy websites.[3] BCI could do something similar to forensic genetic genealogy using the CODIS database on a much smaller scale, but BCI was only doing this for a few cases per year due to its time-consuming

---

[3] The DNA testing in this case and forensic genetic genealogy will be discussed in more detail, *infra*, in the sixth assignment of error.

and cumbersome nature. In order to expedite the process, BCI suggested that law enforcement use a private forensic genetic genealogy company to see if any investigatory leads could be developed in this matter.

{¶13} Law enforcement enlisted the aid of AdvanceDNA to conduct a forensic genetic genealogy search. Once AdvanceDNA conducted its work, the company provided possible genetic leads to the case that included four brothers in the Bortree family: Ralph Bortree, Jeff Bortree, Walter Bortree, and Stoney York. Jeff Bortree was already incarcerated for a heinous rape crime, so his DNA was in the CODIS database. Jeff Bortree was not a match for Anita or Sheila's assailant. Law enforcement then looked at the remaining brothers and decided to first focus on Ralph because he more closely fit the physical description provided by Anita *and* his records indicated that he owned a truck matching Anita's description around the time of the incident with a license plate reading "NM4FA." Further, at one point Bortree lived in Quincy within 500 feet of Anita.

{¶14} Law enforcement officers conducted surveillance on Bortree, particularly at his place of employment. Bortree was observed smoking cigarettes on break, so law enforcement officers put a foil "trap" in the receptacle where Bortree disposed of his cigarettes. The trap was eventually collected, containing four cigarettes. The cigarettes were tested for DNA and three of the cigarettes, the ones that were all "lights" with a white end, were consistent with the semen DNA

in Anita's case at a rate rarer than 1 in 1 trillion.[4] The other cigarette, with a different style filter, was from an unrelated individual.

{¶15} Law enforcement officers then collected all the information it had acquired, including the fact that Bortree and his wife had owned vehicles matching the description of those in Anita's case and Sheila's case around the time of their incidents, and law enforcement officers acquired a search warrant for Bortree's residence and his personal DNA. Photographs of Bortree and his vehicles from around the time in question were collected during the search. Bortree's DNA was again taken and it was again found to be consistent, to a reasonable degree of scientific certainty, with the DNA taken from Anita's clothing.[5] Photographs of Bortree himself from the time period near to when Anita's rape occurred were seized during the search of his residence and they were similar to the sketch that had been drawn with Anita's assistance. Further, during the search, Bortree admitted to law enforcement that he owned a truck fitting the description given by Anita, but he denied knowing Anita and he denied any rape taking place.

{¶16} On August 20, 2019, Bortree was indicted in Logan County for the attempted aggravated murder of Anita in violation of R.C. 2923.02(A) and R.C. 2903.01(B), a first degree felony. The rape and kidnapping incidents were not

---

[4] Both Anita and Sheila testified that after their rape incidents their rapist gave them a cigarette, specifically a light cigarette.

[5] It was similarly determined to a reasonable degree of scientific certainty that Bortree provided the DNA that was on Sheila's blouse.

charged because the statute of limitations had passed.[6]  Bortree pled not guilty to the charge.

**{¶17}** On August 28, 2019, Bortree filed a "Motion to Dismiss Count 1 Pursuant to the Applicable Statute of Limitations Contained in R.C. 2901.13", arguing that the applicable statute of limitations had expired prior to the prosecution filing its indictment commencing this case. Specifically, Bortree argued that the prosecution was required to bring an action alleging the offense of attempted aggravated murder within six years after the commission of the offense, applying the statute generally governing felony offenses because R.C. 2901.13, the statute governing the limitations of criminal prosecutions, does not explicitly state a period for the prosecution of *attempted* aggravated murder.  Bortree claimed that in this instance the prosecution "waited" 26 years to file the indictment, well beyond the general statute of limitations set forth for felony offenses.  The state responded by arguing that R.C. 2901.13 should be interpreted to treat the offense of attempted aggravated murder the same as the offense of aggravated murder, which explicitly has no statute of limitations.

**{¶18}** On September 12, 2019, the trial court issued an opinion discussing the 1999 legislative amendments to R.C. 2901.13 modifying the statutory language

---

[6] Similarly, the rape of Sheila was not charged in Shelby County because the statute of limitations had passed, falling just outside the timeframe of the newly enacted R.C. 2901.13(D), which extended the statute of limitations for rape even beyond 25 years in some cases that have DNA.

of the statute of limitations. Previously the statute used the terms "aggravated murder and murder" when excluding those offenses from the general six-year statute of limitations for felonies. Beginning in 1999, the statute removed the words "aggravated murder and murder" and replaced them with the specific statute numbers, specifying that the prosecution for a violation of R.C. 2903.01 (aggravated murder) and R.C. 2903.02 (murder) had no applicable period of limitation. The trial court concluded that by amending the statute to reference the statutory numbers rather than the names of the offenses, "the legislative intent was to include attempts to commit the offenses of attempted aggravated murder within the provisions of Section 2901.13 of the Revised Code." (Doc. No. 31). Therefore, the trial court found that the prosecution of the indicted attempted aggravated murder offense was not time-barred and that the case could proceed. The trial court subsequently issued a judgment entry overruling Bortree's motion to dismiss on statute of limitations grounds.

{¶19} On December 5, 2019, the State filed a bill of particulars indicating that it intended to use evidence at trial in Anita's case from three other unsolved cases involving allegations of rape and attempted rape/kidnapping/abduction. The state felt that the cases could all be attributed to Bortree. Among those other cases was Sheila's rape in Shelby county.

{¶20} On December 20, 2019, Bortree filed numerous motions seeking to exclude and/or suppress certain evidence from the prosecution's use at trial. These motions included: a Motion to Suppress/in Limine (other acts evidence), a Motion in Limine to Exclude the State's Expert Genetic Genealogy and/or DNA Witness and Evidence, a Motion to Suppress/in Limine (DNA evidence), and a Motion to Suppress/in Limine (evidence from invalid search warrants). Bortree also filed a Motion to Dismiss Due to the State's Prejudicial Preindictment Delay, arguing that material, exculpatory evidence had been compromised or was unavailable as a result of the State's 26-year delay in prosecuting this case. The state filed responses to each of these motions, arguing that exclusion and suppression were not warranted. Bortree filed replies in support of his motions.

{¶21} On June 23-25, 2020, the trial court conducted a hearing on Bortree's numerous pending motions. Both parties submitted closing written arguments.

{¶22} On August 10, 2020, and September 30, 2020, the trial court issued an Opinion and Findings and Additional Findings of Facts and Conclusions of Law, overruling all of Bortree's motions to suppress evidence relating to the DNA evidence, the search warrants, and the testimony and reports of State's DNA expert. The trial court also overruled Bortree's motion to dismiss finding insufficient evidence of prejudicial pre-indictment delay. With regard to the evidence of other acts, the trial court found evidence regarding the rape of Sheila to be admissible

under Evid.R. 404(B), but also found that evidence regarding the two other incidents the state wanted to introduce at trial did not meet the 404(B) standard as it was unclear that Bortree had even been involved in those cases at all. Accordingly, the trial court granted Bortree's motion in limine pertaining to those other cases, but denied his motion in limine as it related to the rape case involving Sheila.

{¶23} The matter proceeded to a jury trial from November 2, 2020, to November 5, 2020. At trial, the state presented the testimony of, *inter alia*, the victim, Anita, numerous members of law enforcement, Anita's treating ER physician from 1993, multiple DNA analysts, and a member of AdvanceDNA explaining how the forensic genetic genealogy created new leads in this case. Bortree challenged the state's evidence but did not call any witnesses on his own behalf. Ultimately the jury found Bortree guilty of attempted aggravated murder.

{¶24} On December 18, 2020, Bortree was sentenced to a maximum 11-year prison term. A judgment entry memorializing his conviction and sentence was filed December 21, 2020. It is from this judgment that Bortree appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred by failing to dismiss this case, as it was initiated after the applicable statute of limitations had expired.**

**Assignment of Error No. 2**
**The trial court erred by failing to dismiss this case due to the State's prejudicial and unjustifiable preindictment delay.**

**Assignment of Error No. 3**
**The trial court erred by failing to exclude other-acts evidence related to the unindicted 1992 Sheila L[.] incident in Sidney.**

**Assignment of Error No. 4**
**The trial court erred by failing to exclude DNA evidence obtained without a warrant from Bortree's cigarette butts.**

**Assignment of Error No. 5**
**The trial court erred by failing to exclude evidence obtained from the execution of two invalid search warrants.**

**Assignment of Error No. 6**
**The trial court erred by failing to exclude the testimony from Amanda Reno and evidence obtained from AdvanceDNA's improper, unsubstantiated, and unverifiable claims regarding its genetic genealogy research in this case.**

**Assignment of Error No. 7**
**The cumulative effect of errors violated Bortree's federal and state constitutional due process rights to a fair trial.**

**Assignment of Error No. 8**
**The evidence at trial was insufficient to support Bortree's conviction.**

**Assignment of Error No. 9**
**The jury erred in finding Bortree guilty of attempted aggravated murder, as the verdict was against the manifest weight of the evidence.**

*First Assignment of Error*

{¶25} In his first assignment of error, Bortree argues that this case was initiated after the applicable statute of limitations had passed. More specifically, he contends that the statute of limitations for a felony offense not expressly listed in R.C. 2901.13 is six years. He argues that while the statutory subsection for

-13-

aggravated murder *is expressly listed in the statute* and aggravated murder has no statute of limitations, *attempted* aggravated murder is *not* expressly listed in the statute and therefore the statute of limitations for the crime must be six years.

Standard of Review

**{¶26}** The interpretation of a statute, such as Ohio's statute of limitations codified in R.C. 2901.13, is a question of law. *See State v. Brown*, 161 Ohio St.3d 276, 2020-Ohio-4623, ¶ 7, citing *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶ 9. We review questions of law de novo. *Id.*, citing *Id.*

Analysis

**{¶27}** The offense in this case was committed July 30-31, 1993. At the time the offense was committed, the statute of limitations, as codified in R.C. 2901.13, read as follows.

> **(A) Except as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:**
>
> **(1) For a felony other than aggravated murder or murder, six years[.]**

**{¶28}** Revised Code 2901.13 was amended effective March 9, 1999, less than six years after the crime in this case occurred. The 1999 amendments extended the statute of limitations for many crimes *and* it applied retroactively to offenses committed prior to the amendments, provided that the statute of limitations had not

expired by the time the statute went into effect. *State v. Rogers*, 12th Dist. Butler No. 2006-03-055, 2007-Ohio-1890, ¶ 8.

{¶29} After the 1999 amendments to R.C. 2901.13 went into effect, the statute read, in pertinent part, as follows.

**(A)(1) Except as provided in division (A)(2) or (3) of this section or as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:**

**(a) For a felony, six years;**

**\* \* \***

**(2) There is no period of limitation for the prosecution of a violation of section 2903.01 or 2903.02 of the Revised Code.**

**(3) Except as otherwise provided in divisions (B) to (H) of this section, a prosecution of any of the following offenses shall be barred unless it is commenced within twenty years after the offense is committed:**

**(a) A violation of section 2903.03, 2903.04, 2905.01, 2907.02, 2907.03, 2907.04, 2907.05, 2907.21, 2909.02, 2911.01, 2911.02, 2911.11, 2911.12, or 2917.02 of the Revised Code, a violation of section 2903.11 or 2903.12 of the Revised Code if the victim is a peace officer, a violation of section 2903.13 of the Revised Code that is a felony, or a violation of former section 2907.12 of the Revised Code;**

**(b) A conspiracy to commit, attempt to commit, or complicity in committing a violation set forth in division (A)(3)(a) of this section.[7]**

---

[7] Subsequent to the 1999 amendments, Revised Code 2903.13 has been further amended, but not in a manner directly relevant to this case. For example, prosecutions involving sexual battery, rape, or an attempt of those crimes has been extended to twenty-five years—or perhaps longer with DNA evidence. R.C. 2901.13(A)(4)/(D)/(L). The statute now reads, in pertinent part, as follows:

**{¶30}** When comparing the statutes, it is evident that the legislature changed R.C. 2903.13 in 1999, removing the phrase indicating that the statute of limitations was six years "[f]or a felony other than aggravated murder or murder" and the language was replaced with language that specifically states "[t]here is no period of limitations for the prosecution of a *violation of section 2903.01*[.]" (Emphasis added.) The trial court found that "[b]y changing the language and focus of the

---

**(A)(1) Except as provided in division (A)(2), (3), or (4) of this section or as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:**

**(a) For a felony, six years;**

**\* \* \***

**(2) There is no period of limitation for the prosecution of a violation of section 2903.01 or 2903.02 of the Revised Code.**

**(3) Except as otherwise provided in divisions (B) to (J) of this section, a prosecution of any of the following offenses shall be barred unless it is commenced within twenty years after the offense is committed:**

**(a) A violation of section 2903.03, 2903.04, 2905.01, 2905.32, 2907.04, 2907.05, 2907.21, 2909.02, 2909.22, 2909.23, 2909.24, 2909.26, 2909.27, 2909.28, 2909.29, 2911.01, 2911.02, 2911.11, 2911.12, or 2917. 02 of the Revised Code, a violation of section 2903.11 or 2903.12 of the Revised Code if the victim is a peace officer, a violation of section 2903.13 of the Revised Code that is a felony, or a violation of former section 2907.12 of the Revised Code;**

**(b) A conspiracy to commit, attempt to commit, or complicity in committing a violation set forth in division (A)(3)(a) of this section.**

**(4) Except as otherwise provided in divisions (D) to (L) of this section, a prosecution of a violation of section 2907.02 or 2907.03 of the Revised Code or a conspiracy to commit, attempt to commit, or complicity in committing a violation of either section shall be barred unless it is commenced within twenty-five years after the offense is committed.**

statute, it is clear that the legislature intended a different result from that which would occur under the previous statute." (Doc. No. 31). The trial court determined that by changing the statute of limitations to the statutory *number* rather than the restrictive words "aggravated murder," the legislature intended to exclude attempted aggravated murder offenses from being time-barred under the statute.

{¶31} We agree with the trial court. Revised Code 2901.13, both at the time of the 1999 amendments and currently, explicitly states there is no period of limitation for the *prosecution* of a *violation* of R.C. 2903.01. This case straightforwardly involves the prosecution of a violation of R.C. 2903.01 through an attempt. Aggravated murder, as charged in this case through an attempt, reads,

> **No person shall purposely cause the death of another \* \* \* while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, [or] rape \* \* \*[.]**

R.C. 2903.01(B). The attempt statute reads,

> **No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.**

In other words, this case involves a prosecution for *engaging in conduct that, if successful*, would constitute or result in the purposeful causing of death of another while committing, of fleeing immediately after, a kidnapping or a rape; i.e. a

-17-

violation of R.C. 2903.01. Accordingly this is a prosecution involving a violation of R.C. 2903.01, and there is no statute of limitations.

{¶32} Moreover, we would note that while Bortree encourages us to find that it was legislative oversight in failing to add "attempt" of aggravated murder into the amended version of R.C. 2901.13 in 1999—and still currently a legislative oversight since this language has not been changed—rendering the statute of limitations six years for attempted aggravated murder, Bortree's argument would lead to an absurd result. Under the amended statute of limitations in 1999, an attempt to commit crimes like kidnapping, robbery, aggravated robbery, felonious assault, etc. is extended from six years to *twenty years*. In 2016 the limitations period for rape and sexual battery, or an attempt thereof, was extended to twenty-five years. *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105 at fn. 2. It would be utterly illogical that an attempt to commit the most serious crime in the Ohio Revised Code would have a *significantly shorter* statute of limitations than an attempt to commit other first (and some second and lower) degree felonies. For these reasons, Bortree's first assignment of error is overruled.

*Second Assignment of Error*

{¶33} In his second assignment of error, Bortree argues that the trial court erred by failing to dismiss this case due to prejudicial and unjustifiable

-18-

preindictment delay. More specifically, he argues that his indictment 26 years after the crime was committed caused numerous pieces of evidence to be lost or stale.

Standard of Review

{¶34} "In reviewing a trial court's decision on a motion to dismiss for preindictment delay, this court applies a de novo standard of review to the legal issues, but we afford great deference to the findings of fact made by the trial judge." *State v. Robinson*, 8th Dist. Cuyahoga No. 107950, 2019-Ohio-4458, ¶ 25, *appeal not allowed*, 2020-Ohio-1634.

Analysis

{¶35} In general, the primary safeguard against pre-indictment delay is the applicable statute of limitations. *State v. Carter,* 5th Dist. Richland No. 07-CA-4, 2007-Ohio-5259, ¶ 16. However, the Due Process Clause of the Fifth Amendment also provides limited protection against preindictment delay. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 97, citing *United States v. Lovasco*, 431 U.S. 783, 789-90, 97 S.Ct. 2044 (1977). The Supreme Court of Ohio has recognized a "comparable due-process protection under Article I, Section 16 of the Ohio Constitution." *Adams* at ¶ 97, citing *State v. Luck*, 15 Ohio St.3d 150 (1984) at paragraph two of the syllabus.

{¶36} A defendant alleging a due-process violation based on preindictment delay must present evidence establishing substantial prejudice to his right to a fair

trial. *Adams* at ¶ 98, citing *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997). Importantly, unlike a Sixth Amendment speedy-trial claim, "*no presumption of prejudice arises in the due-process context when a preindictment delay exceeds a particular length of time*." (Emphasis added.) *Adams* at ¶ 98, citing *United States v. Schaffer*, 589 F.3d 414, 425 (6th Cir. 2009). Nevertheless, a delay in commencing a prosecution is not justified when the state uses the delay to gain a tactical advantage or, through negligence or error, the state ceases its investigation and then later, without new evidence, decides to prosecute. *Id*.

{¶37} The Supreme Court of Ohio has held that if the defendant makes a preliminary showing of substantial prejudice, then the burden shifts to the state to present evidence of a justifiable reason for the delay. *Adams* at ¶ 99, citing *State v. Whiting*, 84 Ohio St.3d 215, 217 (1998). However, some courts, including the Sixth Circuit Court of Appeals, have held that under the Fifth Amendment, the defendant retains the burden of proof *at all times* and must affirmatively demonstrate both substantial prejudice to his right to a fair trial *and* that the delay was an intentional device by the government to gain a tactical advantage. *Adams* at ¶ 99 citing *Schaffer* at 424.

{¶38} The Supreme Court of Ohio has held that "The burden upon a defendant seeking to prove that preindictment delay violated due process is " 'nearly insurmountable,' " especially because proof of prejudice is almost always

speculative. *Adams* at ¶ 100, quoting *United States v. Montgomery*, 491 Fed. Appx. 683, 691 (6th Cir.2012).

{¶39} In this case, Bortree argues that the 26-year delay between the incident in question and his indictment violated his Due Process rights, if not the statute of limitations, which we resolved in the previous assignment of error. In support, Bortree argues that photos of the victim's injuries had been lost; that various witnesses had faded memories; that the 911 recording, if a recording ever existed, had been lost; that if Anita's car could be located there was no way to pull fingerprints if they were ever present; that the vehicles used to abduct Anita and Sheila were no longer available; and that railroad employees who saw a vehicle by the tracks in Sheila's incident had since died.

{¶40} The trial court analyzed the arguments and claims made by Bortree and found that while some evidence had been lost in this matter since 1993 such as the pictures of Anita's injury, Bortree "has not demonstrated how the lost evidence would assist him in his defense, leaving us to speculate as to its effect. Much of it is hearsay and while it may be admissible in a [suppression] hearing of this nature, presentation to a jury is another matter." (Doc. No. 130).

{¶41} Giving deference to the trial court's factual findings, while reviewing the legal conclusions de novo, we agree with the trial court. Photographs of Anita's gruesome injury could have hurt Bortree's case as much as helped it. Further, there

is no indication that any of the other evidence Bortree claims had been lost to time was exculpatory; rather we would have to baldly speculate that the evidence existed at all in some instances, that it would have been important, exculpatory, relevant, and admissible. Mere speculation, the possibility of faded memories, inaccessible witnesses, and lost evidence is insufficient to demonstrate actual prejudice. *State v. Jones,* 148 Ohio St.3d 167, 2016-Ohio-5105, ¶ 21.

**{¶42}** Moreover, even if Bortree was able to establish some prejudice that was not speculative, there is absolutely no indication that any delay by the state in this matter was done to gain a tactical advantage. Rather, the state promptly brought the charges once technology had advanced to a point that the assailant in this matter could be identified. *See State v. Danzy*, 8th Dist. Cuyahoga No. 109433, 2021-Ohio-1483, ¶ 26. Based on the evidence the state presented, the trial court found that there was nothing in the record to suggest that the delay was designed or intended to mislead or gain any technical or tactical advantage, and we agree.[8] For all of these reasons, Bortree's second assignment of error is overruled.

---

[8] Bortree's primary claim was that the case simply was not worked on from 1993 to 2014 and that it was technically possible to find that he owned a red Ford XLT F150 Lariat with a license plate beginning with NM in the voluminous vehicle records. The trial court found this argument factually unavailing and we find no error with that conclusion. The DNA was tested again in 2004, albeit unsuccessfully.

*Third Assignment of Error*

**{¶43}** In his third assignment of error, Bortree argues that the trial court erred by failing to exclude other-acts evidence related to the unindicted 1992 Sheila L. kidnapping and rape incident in or around Sidney, Ohio.

Legal Standard

**{¶44}** "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36, citing Evid.R. 404(B). In other words, " 'evidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a defendant's character or that the defendant acted in conformity therewith.' " *State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, quoting *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24. *See* Evid.R. 404(A). However, under Evid.R. 404(B), "the admission of 'other acts' extrinsic to the charged offense * * *" is permissible in certain circumstances. *State v. Lester*, 3d Dist. Union Nos. 14-18-21, 14-18-22, 2020-Ohio-2988, ¶ 43. *See also* R.C. 2945.59.

**{¶45}** In determining whether other acts evidence is admissible, the Supreme Court of Ohio has set forth a three-step analysis. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 19-24.

> **'The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'** [*Williams* at] ¶ 20, citing Evid.R. 401. *See also* [*State v.*] *Hartman*[, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651,] ¶ 24, 28.

*State v. Williams*, 3d Dist. Allen No. 1-19-70, 2021-Ohio-256, ¶ 16. "The threshold question is whether the evidence is relevant." *Smith* at ¶ 37. "The rule governing the admissibility of other-acts evidence does not bypass the relevancy determination." *Hartman* at ¶ 25. But

> **the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant.** *Hartman* **at ¶ 25;** *see* **1A Wigmore, Evidence, Section 58.2, at 1212 (Tillers Rev. 1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute.** *Hartman* **at ¶ 26-27.**

*Smith* at ¶ 37. For this reason, "the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the *particular purpose* for which it is offered." (Emphasis sic.) *Hartman, supra*, at ¶ 26; *Smith, supra*, at ¶ 37.

> **'The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).'**

*Williams*, 2021-Ohio-256, ¶ 16 (3d Dist.), quoting *Williams*, 2012-Ohio-5695, ¶ 19-20. Evidence Rule 404(B) states that other acts evidence may be admissible to

-24-

establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). "The key is that the [other acts] evidence must prove something other than the defendant's disposition to commit certain acts." *Smith, supra*, at ¶ 36, quoting *Hartman, supra*, at ¶ 22.

**{¶46}** These first two steps of the Supreme Court of Ohio's analysis present questions of law and are subject to a de novo standard of review on appeal. *State v. McDaniel*, 1st Dist. Hamilton No. C-190476, 2021-Ohio-724, ¶ 17; *Hartman* at ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019) ("[d]etermining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a de novo standard" of review).

**{¶47}** Importantly, "[t]he analysis does not end once a proponent has established a permissible nonpropensity purpose for the admission of other-acts evidence." *Hartman* at ¶ 29.

> **'The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.' *Williams*[, 2012-Ohio-5695,] ¶ 20, citing Evid.R. 403. *See also Hartman* at ¶ 29.**

*Williams,* 2021-Ohio-256, at ¶ 16 (3d Dist.). "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the

-25-

probative value of the evidence also increases and the risk of *unfair* prejudice decreases." (Emphasis sic.) *Hartman, supra*, at ¶ 31.

**{¶48}** This third step "constitutes a judgment call which we review for abuse of discretion." *McDaniel* at ¶ 17; *see also Hartman, supra*, at ¶ 30 (holding that "[b]alancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion").

> **An abuse of discretion is not merely an error of judgment. *State v. Sullivan*, 2017-Ohio-8937, [102 N.E.3d 86], ¶ 20 (3d Dist.). Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious. *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23. When the abuse of discretion standard applies, an appellate court is not to substitute its judgment for that of the trial court. *State v. Thompson*, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 11 (3d Dist.).**

*State v. Miller*, 3d Dist. Hancock No. 5-20-15, 2020-Ohio-5377, ¶ 11.

Analysis

**{¶49}** In this case, the state sought to introduce evidence at trial of three other victims of rape/kidapping/abduction, or an attempt thereof, separate from Anita, in order to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" pursuant to Evid.R. 404(B). One of those sexual assault victims was Sheila L., and the trial court permitted testimony related to her incident based on the following analysis:

Case No. 8-20-67

> **The Court finds that the incident involving Sheila L[.] meets the qualifications required by the Supreme Court [of Ohio]. There is sufficient evidence to connect the Defendant to that case to obviate any misleading of the jury. Further, there are sufficient similarities between the [Sheila L.] incident and the instant case to make it relevant to substantial issues in this case. They would include the use of a vehicle as the method of abduction, threat of violence, use of a revolver as an intimidating factor, requiring the victim to put herself in a place where she could not ascertain travel location, taking the victim to a remote location, manner of arousal and oral as opposed to vaginal sex. The Court further finds that such evidence would be more probative than prejudicial and will permit it to be presented to the trier of fact.**

(Doc. No. 130).

{¶50} While the trial court permitted testimony related to the Sheila L.

incident in Sidney under Evid.R. 404(B), the trial court granted Bortree's motion in

limine excluding the testimony of two other potential victims, reasoning as follows:

> **As to the incidents involving** [two other women]**, the Court finds that these may not be presented to the trier of fact. There is not a sufficient indication of identification of Defendant to permit a connection without speculation. The State appears to suggest that there are sufficient similarities to the other two incidents to warrant their consideration. Standing alone, the two incidents without identification could not be considered by the jury. The purpose of such evidence is to allow a connection from the other acts to the instant case and not the other way [a]round. The State asks the Court to permit the jury to infer culpability in two previous incidents where there is no identification by reason of incidents wherein there is identification so that those two previous incidents may bolster the identification in the instant case. This is not a permissible use of such evidence. The Court finds that the prejudicial effect of such evidence outweighs any probative value it might have.**

(*Id.*)

{¶51} Based on the trial court's rulings, evidence was presented at trial related to the Sheila L. incident but not the other incidents. Bortree argues on appeal that the evidence regarding the Sheila L. incident was irrelevant to the actual purpose it was offered, improper, and prejudicial, and that it should have been excluded under Evid.R. 404(B).

{¶52} As noted by the trial court in its ruling, the evidence regarding the Sheila L. incident was relevant, and it could have been used to establish numerous admissible purposes under Evid. R. 404(B). For example, the evidence related to Sheila L. is relevant to establishing identity, and to establishing modus operandi, which means "method of working." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 37. In both Anita's case and the Sheila L. incident, the women were abducted at night, in a vehicle, by a man at gunpoint. The women were made to get into hidden positions in the vehicle, driven to remote areas, then let out to undress. Once the women were undressed Bortree either fondled them or attempted to do so,[9] he had the women perform fellatio on him, he ejaculated in their mouths, allowed them to get dressed, drove them around for a while, and allowed the victims to smoke his light cigarettes. The details are similar enough to establish a kind of "fingerprint" that would satisfy identity or modus operandi under Evid.R. 404(B).

---

[9] Sheila told Bortree she had an infection, which stopped Bortree from performing oral sex on her.

{¶53} Notably, this case presents a very different situation than *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, wherein the Supreme Court of Ohio rejected 404(B) evidence when identity of the alleged perpetrator *was not actually in dispute*. Further, *Hartman* rejected 404(B) evidence under a "modus operandi" argument when the evidence contained very few similarities, thus lacking a specific "fingerprint." This case presents a much more specific behavioral fingerprint than *Hartman*, where the only similarity was that the victim was sleeping. Thus based on the similarities between this case and Sheila's incident, there were relevant, permissible purposes for the evidence under Evid.R. 404(B).

{¶54} Taking all this into account, the trial court then determined that the 404(B) evidence in this case was more probative than prejudicial, a finding that we do not find to be an abuse of discretion given all that the evidence helps establish in this matter. And, particularly unlike *Hartman*, since Bortree's identity was in dispute.

{¶55} Finally, we would emphasize that the trial court was clearly aware of the danger of the Sheila L. evidence being used improperly by the jury, so the jury was instructed on *multiple* occasions throughout the trial that the evidence was not to be used to show propensity or bad character.[10] For all of these reasons we do not

---

[10] Given the jury instructions *and* the DNA evidence in this case, it would be hard to fathom how even if the 404(B) was erroneously admitted in this matter, it would be anything other than harmless. *See Hartman* at ¶ 66.

find that the trial court erred by permitting testimony related to the Sheila L. incident. Therefore, Bortree's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶56} In his fourth assignment of error, Bortree argues that the trial court erred by failing to exclude DNA evidence obtained without a warrant from Bortree's discarded cigarettes.

Standard of Review

{¶57} Review of a trial court's decision on a motion to suppress presents a mixed question of law and fact. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court acts as the finder of fact in evaluating a motion to suppress; therefore, it is in the best position to resolve factual questions and evaluate the credibility of witnesses. *Burnside* at ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*; *see also State v. Johnson*, 10th Dist. Franklin No. 13AP-637, 2014-Ohio-671, ¶ 6 ("We apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress.").

Analysis

**{¶58}** In this case, after law enforcement officers received new investigative leads from AdvanceDNA, they conducted surveillance on Bortree. Law enforcement officers observed Bortree purchasing "light" cigarettes and smoking them outside his place of employment. Bortree was then observed discarding his used cigarettes in a receptacle outside his place of employment—a receptacle that was accessible to any of the other employees. Law enforcement officers then created a foil "trap" to catch discarded cigarettes and they removed the trap after Bortree had deposited several cigarette butts inside. The cigarettes in the receptacle were tested for DNA and compared to the DNA that had been extracted from the semen on Anita's shirt.

**{¶59}** On appeal, Bortree argues that law enforcement improperly searched and seized his DNA by taking the cigarette butts and testing the DNA on them. He contends that the cigarette receptacle was placed on private property at his place of employment and that he had a legitimate privacy expectation in his discarded genetic material.

**{¶60}** Contrary to Bortree's argument, there is generally no expectation of privacy in discarded material. In *Abel v. United States*, 362 U.S. 217, 241 (1960), the Supreme Court of the United States held that items seized by officers from the wastebasket of the defendant's hotel room should not have been

suppressed. The Court concluded that "petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia.* There can be nothing unlawful in the Government's appropriation of such abandoned property."

{¶61} The ruling in *Abel* regarding discarded items has been applied in cases throughout the country related to DNA taken from discarded items. *See Commonwealth v. Ewing,* 67 Mass.App.Ct. 531, 854 N.E.2d 993 (2006) (holding that a defendant did not have a reasonable expectation of privacy in cigarette butts that he voluntarily abandoned as trash, and the DNA evidence obtained was admissible, absent evidence of coerced abandonment, even if the defendant's trash was obtained under a ruse); *Piro v. State,* 146 Idaho 86, 190 P.3d 905 (Ct.App.2008) (holding that a suspect did not have a reasonable expectation of privacy in his discarded genetic material left on a water bottle in an interrogation room); *Commonwealth v. Perkins,* 450 Mass. 834, 883 N.E.2d 230 (2008) (holding that a defendant did not have a reasonable expectation of privacy in his abandoned cigarette butts or a soda can that he left in an interrogation room and were subsequently tested for his DNA); *Commonwealth v. Cabral,* 69 Mass.App.Ct. 68, 866 N.E.2d 429 (2007) (holding a defendant did not maintain an expectation of privacy in spit he left on a public sidewalk, or the DNA retrieved from his saliva; objectively, society would not recognize his expectation of privacy in his spittle as

reasonable); *People v. Sterling,* 57 A.D.3d 1110, 869 N.Y.S.2d 288 (2008) (holding that once the police lawfully obtained a discarded milk carton from an imprisoned defendant, he no longer retained any expectation of privacy in his discarded genetic material); *State v. Athan,* 160 Wash.2d 354, 158 P.3d 27 (2007) (holding that a police ruse to obtain DNA from a suspect's saliva after his licking an envelope was constitutional and the DNA evidence was admissible under both state and federal constitutions, because the defendant could not maintain a reasonable expectation of privacy in his discarded genetic material, there was no recognized privacy interest in voluntarily discarded saliva, and there exists a legitimate government purpose in collecting a suspect's discarded DNA for identification purposes); *see also* Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment & Genetic Privacy*, 100 Nw. U.L. Rev. 857, 865 (2006) ("With abandoned DNA, existing Fourth Amendment law appears not to apply at all.").

{¶62} Based on the controlling and the persuasive legal authority, Bortree could not maintain a reasonable expectation of privacy in his discarded material, or the genetic material contained upon it. In fact, this is precisely what the trial court found when it denied Bortree's suppression motion, reasoning as follows:

> **The Court finds that Defendant voluntarily abandoned his smoking materials by depositing them in a receptacle provided by his employer. At the time, he was in a common area shared by other smokers and was under observation by Logan County officers from across the street. The fact that the officers trespassed on the employer's property to enable them to collect**

> **the material violated no right of Defendant. Consequently, he has
> no standing to object.**

(Doc. No. 130).[11]

{¶63} After reviewing the record and the applicable legal authority, we cannot find that the trial court erred by denying Bortree's suppression motion with regard to the DNA taken from the discarded cigarettes. His arguments both to the discarded material and his privacy interests are unavailing. Therefore, Bortree's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶64} In his fifth assignment of error, Bortree argues that the trial court erred by failing to exclude evidence obtained from the execution of what he characterizes as two invalid search warrants. More specifically, he argues that the affidavits in support of the warrants to search Bortree's residence and his DNA contained information unconstitutionally obtained, that they contained false or inaccurate information, that they contained inferences that usurped the magistrate's inference-drawing ability, and that they lacked probable cause.

---

[11] The employer's property was not surrounded by a fence; rather, law enforcement walked up to the receptacle that was stationed outside of an employee door. It was located off a short driveway connected to a public access road. The officers conducted surveillance primarily from a gas station nearby.

Analysis[12]

{¶65} At the outset, we note that in Bortree's fifth assignment of error, he makes a number of broad accusations regarding issues with the affidavits in support of the search warrants, but he does not cite to any specific paragraphs of the affidavits or direct us to specific sections he claims where evidence was "unconstitutionally obtained." Similarly, he does not show which paragraphs he feels are inaccurate, or usurped the magistrate's inference-drawing authority. Rather, he refers us to documents that had previously been filed in the trial court for a more thorough treatment of the matter. Generally this is not compliant with the appellate rules; however, having reviewed the record in its entirety, in the interest of justice we will address the matter.

{¶66} In this case the affidavit for the search warrant of Bortree's home contained 32 enumerated paragraphs and a summary, which totaled approximately 7 pages of text. The affidavit described the Sheila L. incident, and the fact that Bortree's wife owned a vehicle consistent with the one Sheila identified in that incident around the time the incident happened. The affidavit described other assault/rape/kidnapping incidents that Bortree was suspected to be involved in that the trial court later suppressed. The affidavit then described Anita's incident, her description of the suspect, his truck, and the license plate that began with "NM."

---

[12] To the extent that Bortree sought suppression related to the items seized in the searches, the standard of review from the previous assignment of error applies here.

The affidavit stated that Bortree owned a truck matching the description at the time of the incident with a license plate reading "NM4FA," consistent with Anita's description. The affidavit then detailed the DNA process that had taken place over the years, including the use of forensic genetic genealogy. Further, the affidavit indicated that Bortree's DNA had been secured from the cigarette butts discussed in the previous assignment of error, and that the DNA was consistent with the DNA left on the clothing from both Anita and Sheila's cases. Notably, the affidavit in support of the search warrant for Bortree's DNA was shorter, with roughly half as many paragraphs focusing specifically on Anita's case and the need for DNA confirmation.

{¶67} Given the information in the affidavits and the testimony at the suppression hearing, the trial court rejected Bortree's challenges to the affidavits, conducting the following analysis:

> **The affidavits are extensive and go into considerable detail. An affiant is obliged to demonstrate that probable cause exists to obtain a warrant. It does not require proof beyond a reasonable doubt. The Judge is at liberty to ask questions and to conduct a hearing to obtain additional information if he so desires. The evidence at the [suppression] hearing revealed that perhaps some erroneous information concerning minor matters was contained in the affidavit. The Court finds further, however, that such information was not critical to the Judge's understanding, that he was fully and fairly apprised of the situation and that the statements contained in the affidavit were made in good faith and not with any intent to mislead. The Court finds that the affidavits were sufficient to demonstrate probable cause and were appropriately signed by the Judge.**

(Doc No. 130).

**{¶68}** After reviewing the record and the trial court's decision, we cannot find that the trial court erred by finding that the affidavits supported a determination of probable cause. The key details are present in the affidavits, such as Anita's incident, her recollection of the event and identifying characteristics, and the DNA that matched Bortree. Further, the vehicles also matched Anita's description and the partial license plate she provided.

**{¶69}** While one of the affidavits may have had extraneous details about other unindicted offenses Bortree was suspected of that were later suppressed, and while both of the affidavits may not have contained *all* of the DNA and forensic genealogy details, the affidavits were readily sufficient for a neutral and detached magistrate to find that probable cause was present to issue the search warrants. We do not find that any of the claimed inaccuracies or "improper" inferences rendered the warrants invalid.

**{¶70}** Importantly, a reviewing court must read the affidavits holistically, examining the totality of the circumstances and employing a healthy dose of common sense. *United States v. White*, 874 F.3d 490, 502 (6th Cir.2017), citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir.2001). If an inference is obvious from the factual context, a reviewing court should indulge it. *United States v. Allen*, 211 F.3d 970, 975 (6th Cir.2000) (en banc). Here, the facts outlined in the

affidavits are sufficient to support a finding of probable cause to search Bortree's home and his DNA (for further confirmation).

{¶71} Moreover, the officers in this case obtained warrants signed by a judge who determined that probable cause was present in this matter. There is nothing in the record to indicate that the officers conducting the search pursuant to the warrants were acting in anything other than good faith when they conducted the search, thus there could be no suppression in this case for that reason alone. "The United States Supreme Court has held that the exclusionary rule should not be applied in situations in which an officer has relied in good faith on a warrant issued by a neutral and detached magistrate or judicial officer, notwithstanding the fact that the warrant is later found to be invalid." *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, ¶ 17, cert. denied, 141 S.Ct. 851. For all of these reasons we cannot find that the trial court erred; therefore, Bortree's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶72} In his sixth assignment of error, Bortree argues that the trial court erred by failing to exclude testimony and evidence related to the work conducted in this matter by AdvanceDNA.

The DNA and Forensic Genetic Genealogy Process in this Case

{¶73} At the suppression hearing in this matter, various witnesses detailed the DNA analysis in this case as it was conducted over the years, the improvements

in the DNA process that led to a DNA profile of Anita's assailant eventually being extracted and placed into CODIS, and, finally, the involvement of AdvanceDNA in the burgeoning field of forensic genetic genealogy to provide law enforcement with possible investigatory leads in this case.

{¶74} Erika Jimenez, a BCI DNA analyst, testified that in 1993 a number of items were submitted for testing in this case including, *inter alia*, a black t-shirt and oral swabs from Anita. Jimenez testified that in 1993 "they did forensic biology, which is looking for body fluids such as blood and semen as well as doing blood typing for ABO blood typing." (June 24, 2020, Tr. at 172). She clarified that they were not doing "DNA" testing at the time as it is now known, merely blood typing. (*Id.* at 173). A possible suspect was submitted in Anita's case in 1993 but he was excluded through the blood-type testing that was done at the time.

{¶75} As BCI was not doing DNA analysis at the time, the oral swabs taken from Anita in 1993 were sent to a private company; however, the private company found no foreign DNA in the oral swabs that could be extracted, despite the fact that the oral swabs were "sperm search positive." (*Id.* at 176). Jimenez testified that the DNA testing done at the time was an "older technology, and we need[ed] a lot of DNA to get a profile. So there wasn't a lot of sperm there. So it's not surprising that we just found the victim's [DNA] whose oral swab it was from." (*Id.* at 176-177).

{¶76} Jimenez testified that 11 years later, in 2004, newer technology emerged that needed less DNA to get a profile. Jimenez testified that the sample in this case was sent to an outside lab due to backlogs at BCI. The oral swabs were sent along with Anita's shorts, but only Anita's DNA was able to be identified. Thus in 2004 the technology had not improved to a significant degree to extract a profile.

{¶77} In 2014, Detective Phil Bailey of the Logan County Sheriff's Department called BCI asking if any new developments in the DNA field could assist in this case. Jimenez testified that a new kit called "Identifiler" had been released in recent years and that BCI would try and check the semen positive shirt since that had not been done yet. The 2014 extraction showed Anita's DNA and that there was someone else's DNA present on the shirt, but a full DNA profile could not be developed at that time with the Identifiler technology. However, Jimenez testified she was aware that a newer technology would be "coming on line" soon, so they waited for the new technology to test for DNA again.

{¶78} Jimenez testified that in 2015, the "GlobalFiler" kit came "on line" so they tested the DNA from the shirt with the new system. This time, a DNA profile was extracted and that a profile of an unknown male was uploaded into the CODIS database "which searches [a sample] against other samples that are known and unknown [and already in the system] to see if we could figure out who contributed that DNA to the sample." (June 24, 2020, Tr. at 185). Through CODIS, it was

learned that the DNA sample from Anita's case matched the DNA sample from the perpetrator in the Sheila L. case. Thus while the perpetrator in both instances was unknown at that time—a "known" sample of his DNA was not in the CODIS database—it was, to a reasonable degree of scientific certainty, the same perpetrator in both Anita's case and Sheila's case.[13]

{¶79} Without a suspect to check the DNA against, there was nothing more BCI could do at the time. In 2018, Detective Bailey again called BCI asking if anything else could be done with the unknown male profile. BCI had started doing something called "familial DNA testing," which used the "CODIS database and it searches the database against your unknown sample to look for any first-degree relatives that might be present in the system. So we're looking for a brother, a father, a son to the unknown sample." (*Id.* at 193). Through the "familial DNA testing" the relative that could be found would have to be a first-degree relative of the person already in the CODIS system.

{¶80} Jimenez testified that while BCI started doing familial DNA testing in late 2016, it took such a long time and so many resources that only three to four cases per year were being taken through familial testing. Jimenez testified that the backlog was already over thirty cases long, so while she wanted to get Anita's case on the list, a committee determined what cases were next for familial searches.

---

[13] One suspect at the time had his DNA checked against the newly extracted profile, but he was excluded.

Anita's case was added to the list, but Jimenez was aware that "genetic genealogy" was another tool that could be used if police departments had money to do it, and "that might be a faster route [than familial DNA testing through BCI] because of the only three to four cases that were being done per year for the familial at our state lab." (June 24, 2020, Tr. at 195).

{¶81} The Logan County Sheriff's Department obtained funding and decided to proceed with the "genetic genealogy." A specific DNA sample called a "single-source sample" had to be produced through a process known as differential extraction. That was conducted successfully and the sample was sent to the private lab "DNA Solutions." According to Jimenez, "Government labs right now don't have the capability to do the technology that is needed for the genetic genealogy. It is different from familial." (*Id*. at 199). DNA Solutions analyzed the DNA and generated all the necessary data, then provided it to the genetic genealogist at AdvanceDNA to do her work. According to Jimenez, the genetic genealogist is generally "trying to see who shares a similar DNA to this [unknown] sample to try and to see where this person comes from or who is related to this person; [whereas] we're doing our comparisons to try to exclude people as being the sample." (*Id*. at 200). Once DNA Solutions provided the necessary data to AdvanceDNA in the appropriate format, the genetic genealogy company was able to begin the research part of building out a possible family tree to create investigative leads.

{¶82} Amanda Reno, owner and director of forensic case management for Advance DNA, provided testimony as to the company's work on genetic genealogy at the suppression hearing. Reno testified that the company "focuses on helping law enforcement identify DNA samples that either belong to unknown decendents [sic] or to DNA samples that were found at a crime scenes, and we use genetic genealogy techniques to do so." (*Id.* at 257-258).

{¶83} Reno testified there were no specific degrees for genetic genealogy, but she had attended the "Forensic Genealogy Institute" and had attended (and taught) other course work. (Tr. at 258). Reno testified that "law enforcement and genealogy just really started being used [together] in the [sic] mid 2018." (*Id.* at 259). Reno testified that prior to that shift she had helped identify "John or Jane Does who were deceased, such as remains found in the woods, things of that nature. And prior to that, I helped living Does, individuals who were abandoned at birth, identify who they are genetically." (*Id.* at 259).

{¶84} As to her work in this case, Reno testified that she was contacted by Erika Jimenez and Detective Phil Bailey. She indicated that in the initial conversation Reno needed to determine if the case was eligible for genetic genealogy. She testified the criteria she needed was a sufficient quantity of DNA, and that the case had to involve violent crime. Once those criteria were met, AdvanceDNA agreed to work on the case. As part of that work, AdvanceDNA

requested information on the case, including lists of important locations to aid in understanding the geographic region.

**{¶85}** Reno testified that AdvanceDNA received the "DNA file" from DNA Solutions, which contained approximately 800,000 lines of information. That file would then get uploaded to public genealogy sites "GEDmatch" and "FamilyTree.com."[14] (June 24, 2020, Tr. at 269). These websites allow individuals who have their own DNA file, obtained through popular DNA testing sites like 23andMe and AncestryDNA, to upload the DNA file and find close or distant relatives. Reno testified that through the process she can look at relationships to an unknown DNA sample that "extend out to six cousins and beyond." (*Id*. at 272). "We're looking at very small quantities of DNA that are shared, so it can be anything from a close relative that we find or a distant relative that we find in that list." (*Id*. at 272-73).

**{¶86}** Reno indicated that the file in this case was uploaded to GEDmatch on May 28, 2019. At that time the file was uploaded as "law enforcement use for an identification of a DNA sample tied to a violent crime." (*Id*. at 274). This required

---

[14] "GEDmatch is different from its competitors in that it is not a DNA testing service, but a publicly searchable database that allows users who have had their DNA analyzed elsewhere to more deeply investigate their ancestry." Selvin, *A Too Permeating Police Surveillance: Consumer Genetic Genealogy & the Fourth Amendment After Carpenter*, 53 Loy. L.A.L. Rev. 1015, 1020 (2020)

certification from the Logan County Sheriff's Department and it restricted to a degree the use of the public site.[15]

{¶87} Once the profile was uploaded, AdvanceDNA learned that a woman named Judy A. was the closest familial match present in GEDmatch, and Judy's daughter Katie had uploaded a family tree to the site.[16] According to Reno, AdvanceDNA received a hierarchy list of "largest quantity of DNA shared with the DNA sample to the smallest quantity," after uploading the file. (June 24, 2020, Tr. at 282). This "autosomnal DNA" statistic was produced, which showed the average DNA shared by pairs of relatives "in both percentage and centimorgans." (*Id*. at 283). In the case of identical twins, 100 percent DNA would be shared, but the percentage lessens as family members are further removed.[17] According to the data received, Judy A. shared a little less than three percent of her DNA with the subject DNA. Reno testified that based on this percentage, or the centimorgans, this meant that AdvanceDNA was looking for someone who was "possibly a second cousin"

---

[15] On May 20, 2019, GEDmatch changed the structure of its database "pertaining to how low enforcement accesses matching." (June 24, 2020, Tr. at 277). At that time "Law enforcement samples uploaded will only be compared to individuals for matching if the individual has selected that they would like to participate in law enforcement matching." (*Id*. at 277-278). In other words, individuals who uploaded their genetic information to the site had to affirmatively "opt in" and *allow* law enforcement to use their DNA in a manner as it was being used in this case.

[16] "A relative's genetic data can act as a silent witness, or genetic informant, against the person who left the DNA at the crime scene. This 'genetic informant' wordlessly guides law enforcement to a handful of potential suspects, by simply informing them that the suspect is very likely a third-cousin, nephew, or grandson of the person in the DTC database. Public records and newspaper clippings then provide the necessary details to put a name and location to the crime-scene DNA." JD, *Why We Fear Genetic Informants: Using Genetic Genealogy to Catch Serial Killers*, 21 Colum. Sci. & Tech. L. Rev. 1, 4 (2019)

[17] Testimony indicated Bortree did not have an identical twin.

to Judy A. Reno testified, "a second cousin shares * * * great grandparents with the DNA sample." (*Id*. at 285).

{¶88} AdvanceDNA then used information that had already been made publicly available on GEDmatch as well as other public records like census records, marriage records, and birth records to build out a family tree from Judy A. and her daughter. They used the geographic information of the crimes to help focus the areas of the family tree to build, seeking to find the second-cousin-type relationship to give law enforcement some individuals to look into.

{¶89} Ultimately AdvanceDNA created a "Genetic genealogy leads summary report" for the Logan County Sheriff's Department. Based on the DNA, AdvanceDNA felt that law enforcement should look into four brothers in particular: Jeffrey Bortree, Ralph Bortree, Walter Bortree, and Stoney York. However, Jeffrey Bortree could be excluded by law enforcement immediately because he was already incarcerated for a different rape and his DNA was in the CODIS database, thus it was not a match in this case.

{¶90} Law enforcement took the information from AdvanceDNA as a lead and began investigating the remaining brothers. Law enforcement focused first on Ralph Bortree because he fit the description of the assailant at the time of the crimes, he and his wife owned vehicles at the time of the crimes that were consistent with the descriptions provided by Anita and Sheila, and Ralph lived in Quincy in 1993.

After narrowing in on Bortree, law enforcement conducted surveillance on him, and eventually collected his cigarettes for DNA samples, finding the DNA left on them to be a match to the DNA left on Anita's shirt (and also a match to Sheila's case).

Analysis[18]

{¶91} Bortree argued to the trial court, and renews his argument on appeal, that Amanda Reno's testimony should have been excluded from trial because the state never established that Reno complied with GEDmatch's terms of service, that Reno did not preserve all of her research to show how the Bortree family was developed as a lead, and finally that Reno's research relied, in part, upon unverified family trees uploaded on public ancestry websites by unknown individuals. Notably, Bortree cites no legal authority to support his position that the trial court erred in this matter by permitting Reno to testify at trial.

{¶92} Nevertheless, addressing Bortree's concerns, Reno did testify that she complied with GEDmatch's terms of service. (June 24, 2020, Tr. at 333-335). There is no evidence to the contrary in the record, thus this argument is not well-taken.

{¶93} As to Bortree's claim that Reno did not preserve *all* of her research, she gave a detailed accounting of AdvanceDNA's work in this case, including the provision of a written report and a slideshow that showed how AdvanceDNA went

---

[18] The suppression standard of review previously cited would be applicable again here since Bortree was seeking suppression.

from one relative to the next, where the company focused the search, and how the company narrowed the search based on geography. It is unclear what more AdvanceDNA could have produced to aid the matter, and Reno was readily available for cross-examination both at the suppression hearing and at trial for any questions by the defense. Thus Bortree's argument that AdvanceDNA did not do enough to show its process is not well-taken.

{¶94} Finally, Bortree argues that Reno's research relied, in part, on public information uploaded to public websites by unknown individuals. However, the company also relied upon verifiable records and Reno indicated that the company checked to verify information from the family trees uploaded by members of the public.

{¶95} Notwithstanding that point, AdvanceDNA was only providing *possible* leads for police to further investigate, and AdvanceDNA emphasized this from the very beginning. Reno actually testified that if none of the Bortree brothers panned out AdvanceDNA would have built out the family trees further to find another branch where the specific families intersected in hopes of finding a better suspect. In sum, the information provided by AdvanceDNA was merely a tool to provide leads to law enforcement. Law enforcement was then able to check the vehicles Bortree owned, etc., to find if he would be a good possible suspect. Thus Bortree's argument on this issue is not well-taken.

**{¶96}** Notably, forensic genetic genealogy is relatively a new field, but there are numerous law review articles that have spoken about its use, especially since it was used as a tool to help catch the infamous Golden State Killer. *See, e.g.*, Selvin, *A Too Permeating Police Surveillance: Consumer Genetic Genealogy & the Fourth Amendment After Carpenter*, 53 Loy. L.A.L. Rev. 1015 (2020); Brown, *Why We Fear Genetic Informants: Using Genetic Genealogy to Catch Serial Killers*, 21 Colum. Sci. & Tech. L. Rev. 118 (2019); Romine, *Crime, DNA, & Family: Protecting Genetic Privacy in the World of 23andMe*, 53 Ariz. St. L.J. 367 (2021). In this case the trial court found that the evidence did not establish any illegal activity by engaging in forensic genetic genealogy research, and the research did not, in fact, yield any substantive evidence that Bortree had engaged in any criminal activity. Rather, "[i]t merely narrowed the focus of law enforcement." (Doc. No. 130). We agree with the trial court's conclusion that the research merely narrowed the focus of law enforcement, and consequently we can find no error with the trial court's determination to allow the testimony related to forensic genetic genealogy in this matter. Therefore, Bortree's sixth assignment of error is overruled.

Case No. 8-20-67

*Eighth Assignment of Error[19]*

{¶97} In his eighth assignment of error, Bortree argues that there was insufficient evidence presented at trial to convict him of attempted aggravated murder.

Standard of Review

{¶98} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not to determine if the evidence *should* be believed). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*., following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571,

---

[19] The seventh assignment of error will be addressed out of order, at the end of this opinion.

2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

### Controlling Statutes

{¶99} In this case, Bortree was convicted of attempted aggravated murder. Criminal attempt is codified in R.C. 2923.02(A), and reads "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶100} Aggravated murder, as charged in this case, is codified in R.C. 2903.01(B), and reads, in pertinent part, "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, [or] rape * * *[.]

### Analysis

{¶101} At trial in this matter, the state presented the testimony of Anita, who detailed the events of July 30-31, 1993. She testified to being stopped on the way to work by a truck, to being forced at gunpoint onto the floorboards of a red Ford

Lariat XLT with a license plate beginning with the letters "NM," to being driven to a secluded area, to being forced to take off her clothes, to having a man put his hands and mouth on her, and to being forced to perform oral sex on the man until he ejaculated in her mouth. She testified to wiping some of the ejaculate on her shirt, to being driven around after the incident, and ultimately to being removed from the truck and having her throat cut. Anita survived and provided as much detail as she could to law enforcement and her clothes were collected as evidence. She worked with a sketch artist to produce a sketch of her assailant.

{¶102} The state then produced the testimony of numerous witnesses who were involved investigating both this case and the Sheila L. case. Sheila also testified in this matter. DNA analysts and Amanda Reno from AdvanceDNA provided testimony. Ultimately law enforcement detailed how Ralph Bortree was determined to be the primary suspect, how his DNA was obtained both from the cigarettes and later from a search warrant. The DNA was compared to the DNA left on the shirt from 1993 and Bortree was found to be a match at a rate rarer than 1 in 1 trillion.

{¶103} While there was a significant amount of detailed testimony produced over the course of the trial, the salient details were the kidnapping, rape, and attempted murder of Anita on the night in question, and then the connection to Bortree as the perpetrator through DNA. However, Bortree was further identified

through his ownership of the vehicles, and his proximity to living in the area. Furthermore, photographs of Bortree from around the time of the crime looked similar to the sketch that was completed with Anita's assistance.

{¶104} Based on the testimony and the evidence presented, we do not find that there was insufficient evidence presented to convict Bortree of attempted aggravated murder. Bortree's claim that Anita did not make an unequivocal identification of Bortree at the trial and his claim that the semen could have been on Anita's shirt previously are matters for weight of the evidence, not sufficiency. *State v. Martinez*, 3d Dist. Union No. 14-19-28, 2020-Ohio-4883, ¶ 26. Here there was evidence presented on each and every element of the crime that a jury could have found established Bortree's guilt beyond a reasonable doubt. *See State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Therefore, Bortree's eighth assignment of error is overruled.

*Ninth Assignment of Error*

{¶105} In his ninth assignment of error, Bortree argues that even if there was sufficient evidence presented to convict him of attempted aggravated murder, his conviction was against the manifest weight of the evidence.

Standard of Review

{¶106} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting

testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

{¶107} Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

{¶108} Bortree does not make any specific arguments in his brief as to how his conviction was against the manifest weight of the evidence. Nevertheless, he did argue in his sufficiency claim that the DNA on Anita's shirt could have been there long before July 30/31, 1993, and that there was no unequivocal eyewitness identification of Bortree by Anita at trial. However, these are matters of credibility for a jury to determine, and we will not second-guess a jury on these matters. *State*

*v. Gribben*, 3d Dist. Seneca No. 13-19-50, 2020-Ohio-3083, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶109} Moreover, although Anita did not identify Bortree at trial the evidence surrounding the incident firmly established Bortree as the perpetrator. The evidence included the DNA, his ownership of a vehicle matching the description with the appropriate "NM" beginning on the license plate, his height and stature, his similarity to the sketch, his smoking of light cigarettes, his proximity to the crimes, etc. Thus Bortree's claim that Anita did not specifically identify him at trial is largely irrelevant, particularly given the amount of time that had passed.[20]

{¶110} As to his claim that the DNA could have been on the shirt long before the incident in question, there was no evidence of any relationship between Bortree and Anita. In fact, Bortree told law enforcement officers searching his residence that he did not know Anita. Moreover, the jury was presented with Anita's testimony and the surrounding investigation and the jury specifically found in the additional findings on the jury verdict forms that a rape and kidnapping occurred in this matter. Thus even if Bortree was somehow insinuating a consensual encounter, the jury determined otherwise. Ultimately, the evidence supports the jury's conclusion, and we are bound to give the evidence the construction consistent with

---

[20] At trial, Bortree used his cross-examination to target the fact that Anita had identified a man that was not Bortree in a photo lineup in the months after the incident occurred. That man was excluded as a possible suspect in her case. Notably, law enforcement testified that different photo lineup procedures are used now than in the past so as to prevent false identifications.

the jury's determination.[21]  *State v. Richcreek*, 3d Dist. Paulding No. 11-20-03, 2021-Ohio-636, ¶ 34.

**{¶111}** In sum, the evidence supported Bortree's conviction in this matter. We cannot find that the jury clearly lost its way or that a manifest miscarriage of justice was created. For all of these reasons, Bortree's ninth assignment of error is overruled.

*Seventh Assignment of Error*

**{¶112}** In his seventh assignment of error, Bortree argues that even if there was no individual error that was prejudicial enough to deprive him of a fair trial, the cumulative impact of the errors deprived him of his right to a fair trial.

Standard of Review

**{¶113}** "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "To find cumulative error, a court must first find multiple errors committed at trial and

---

[21] Bortree seemed to try and create some doubt with the jury by pointing out that brothers share more DNA than regular unrelated individuals. However, Erika Jimenez testified that Bortree would have to have 300 billion siblings before she would expect one sibling to have the same DNA as him. (Nov. 4, 2020, Tr. at 520).

determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Analysis

{¶114} Because we have found no errors in this matter, let alone cumulative errors, the doctrine of cumulative error does not apply here. *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. For these reasons, Bortree's seventh assignment of error is overruled.

*Conclusion*

{¶115} For the foregoing reasons Bortree's assignments of error are overruled and the judgment and sentence of the Logan County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/jlr**